943 F.2d 51
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James BOND, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 90-3960.
 United States Court of Appeals, Sixth Circuit.
 Aug. 23, 1991.
 
 Before KEITH, Circuit Judge, WELLFORD, Senior Circuit Judge, and GADOLA, District Judge.*
 PER CURIAM:
 
 
 1
 James Bond ("Bond") appeals from the September 12, 1990, order denying social security disability benefits. For the following reasons, we AFFIRM.
 
 I.
 A.
 
 2
 Bond was forty-seven years old on December 31, 1987, when his insured status expired. He completed the ninth grade in school. He had work experience from 1966 to 1981 as a roofer and roofing foreman. Bond alleges that he became disabled as of May 2, 1981, as a result of problems with his back.
 
 
 3
 Bond began to complain of back pain in 1979. He consulted Dr. Paul Bauman ("Dr. Bauman") in July 1979. X-rays were normal except for some spurs at the D11-12 and L3-4 levels. In October 1981 Bond complained to Dr. Bauman that he had some pain radiating into the left thigh. Dr. Bauman diagnosed low back strain and noted that Bond had full range of motion in his back and did not experience muscle spasm.
 
 
 4
 On March 30, 1982, Bond began seeing Dr. George Griffin, III ("Dr. Griffin"). Conservative therapy failed to provide relief of Bond's complaints, but he was too obese for surgical intervention. Bond lost approximately one hundred pounds and was admitted to the hospital on January 8, 1985, for evaluation of his back pain. His neurological examination was intact. X-rays showed minimal marginal spurs at L3-5, with normal disc spaces, vertebral bodies, and spinal alignment. The x-rays were interpreted as showing minimal spondylosis (a general term for degenerative osteoarthritis) of the lumbar spine. A myelogram showed normal root sleeves and was considered normal. On January 10, 1985, Bond was discharged from the hospital.
 
 
 5
 On November 11, 1985, Dr. Griffin responded to a questionnaire from the Bureau of Disability Determination. Dr. Griffin indicated that Bond had no muscle or reflex abnormalities, his muscle strength was full, and he had no muscle spasms or atrophy. The range of motion of his lumbar spine was unimpaired. His gait was normal, he could walk on his heels and toes, and he could rise from a squatting position. Dr. Griffin diagnosed low back pain, instability, and nerve root irritation resulting from facet degeneration. He recommended facet fusion at the L4-5 level. He treated Bond with analgesics, anti-inflamatory agents, and medication for depression. On August 25, 1986, Dr. Griffin added diagnoses of anxiety and depression.
 
 
 6
 Dr. Griffin referred Bond to Dr. Kenneth E. Tepe ("Dr. Tepe"), a psychiatrist, for evaluation of Bond's depression. Dr. Tepe submitted a teledictation report to the state agency in which he stated he saw Bond on May 22, 1986, and diagnosed major depression and chronic post traumatic stress disorder. Bond was oriented to time, place and person, but his mood and affect were significantly depressed and anxious. Bond was frequently depressed and tearful when talking about his feelings of helplessness. He had no delusions, hallucinations, or abnormal behavior. There was an obsessive quality to Bond's depression, showing that he was preoccupied with his disability and nearly phobic to the threat that his pain would recur. His intellectual functioning seemed to be full, but he had a memory deficit, and his ability to concentrate was significantly decreased. Bond's recent and remote memory were, however, "in a more global sense" preserved.
 
 
 7
 Dr. Tepe reported that Bond's activities were restricted, both because of his retarded depression and his back injury. There had also been a profound effect on Bond's interests, habits, and behavior. Bond's interest focussed almost constantly on his preoccupation with his disability. He had a sleep disorder, minimal energy, decreased appetite, and "lousy" concentration. His appearance and concern for his personal needs were decreased, and his ability to relate to others had decreased. He also had a decreased ability to understand and follow directions, to maintain attention, and to perform repetitive tasks. Dr. Tepe described Bond's ability to withstand ordinary stress and work pressures as excessively poor. He also noted that Bond fulfilled the criteria for a major affective disorder--depressed, with significant vegetative aspects of depression. Dr. Tepe determined, however, that Bond's condition could be expected to respond to chemical antidepressant treatment. While Dr. Tepe noted other psychiatric illness, he determined that all of these problems could be handled by drug treatment and psychotherapy.
 
 
 8
 On September 2, 1986, Bond was hospitalized suffering from depression about his back pain and for complaints of palpitation of his lower back. His deep tendon reflexes were reduced, but his motor strength was full. The hospital performed a myelogram. The radiologist viewed the myelogram as unchanged from the prior normal study. The radiologist also administered an x-ray, which he interpreted as showing mild degenerative disc and joint disease of the lumbar spine, with early spurring, very mild narrowing of the L4-5 disc space, and very mild sclerosis of the apophyseal joint margins in the levels of L3-S1. A CT scan showed advanced degenerative apophyseal joint disease at all lumbar levels, particularly at L5-S1. There was no true erosive or destructive process, and despite a slight central bulging of the L3-L4 disc, there was no evidence of a true herniated nucleus pulposus. On September 3, 1986, Bond was discharged from the hospital.
 
 
 9
 Dr. Griffin disagreed with the radiologist's interpretation of these studies, which classified them as essentially normal. Dr. Griffin determined that there was an extradural defect on the myelogram at Bond's L4-5 level and that the CT scan showed a corresponding narrowing of the neural foramina at this level. Dr. Griffin determined that Bond had significant segmental spinal instability and resulting nerve root irritation at the L4-5 level, evidenced by ossification of the pericapsular structures surrounding the nerve root.
 
 
 10
 Dr. Griffin scheduled Bond for surgery. On September 23, 1986, Bond underwent surgery. In surgery Dr. Griffin relieved pressure on the neural foramina at the L3-4 and L4-5 levels. Bond obtained good control of his pain within five days and he was discharged on September 29, 1986.
 
 
 11
 On April 27, 1987, Dr. Tepe had Bond hospitalized for psychiatric treatment. The admitting physical examination showed that Bond had no point tenderness in his spine, no pain in his legs, and there were no motor or sensory deficits. On May 4, 1987, Bond was released after receiving psychiatric treatment.
 
 
 12
 On May 7, 1987, Dr. Griffin submitted an updated questionnaire to the Ohio Disability Determination Section of the Bureau of Vocational Rehabilitation (the "state agency") reporting that there had been an incomplete healing of the fusion mass in Bond's back. Bond had intermittent muscle spasms in his lower back, but he had no reflex or sensory abnormalities. He remained able to walk on his heels and toes and to rise from a squat.
 
 
 13
 On June 16, 1987, Bond underwent a consultative psychiatric examination by Michael T. Farrell ("Farrell"), a psychologist, at the request of the state agency. Bond showed some evidence of suicidal ideation, although he denied any present intention of making an attempt. He was depressed, but was oriented to time, place, and person and was in good contact with reality. His judgment, although simplistic, was fair, and he showed no evidence of significant memory impairment. His attention and concentration might have been moderately affected by his depression. There was no significant somatic preoccupation or anxiety.
 
 
 14
 Farrell administered a battery of psychological tests. There was clinical evidence of significant memory impairment and the Bender-Gestalt test showed signs of organic dysfunction. The Rorschach Inkblot Test showed average intellectual functioning and the Minnesota Multiphasic Personality Inventory suggested anxiety, agitation, and depression, with somatic complaints. Farrell concluded that Bond was experiencing a significant amount of depression, his ability to remember and carry out job instructions appeared fair, his ability to interact with supervisors and coworkers appeared to be fair. Farrell determined that Bond's attention and concentration were in the average range and that he would not have difficulty performing routine and repetitive tasks. He determined that Bond might have difficulty responding to typical work pressures.
 
 
 15
 On June 26, 1987, Dr. Joseph Olasov, ("Dr. Olasov"), a psychologist, reviewed the record on behalf of the state agency. He concluded that Bond had marked limitations in his activities of daily living, but only slight restrictions in social functioning or concentration, persistence or pace. He concluded that Bond was either unlimited or not significantly limited in his understanding and memory, sustained concentration and persistence, social interaction, and adaptation.
 
 
 16
 On December 18, 1987, Dr. Griffin submitted an assessment which stated that Bond was able to lift a maximum of ten pounds and five pounds frequently. He could stand or walk for a half hour at a time for a total of six hours per day and had identical limitations in his ability to sit. Bond was unable to crouch or crawl. He could push or pull, but was limited to resistances of 15-20 pounds. On December 31, 1987, Bond's eligibility terminated. On January 13, 1988, Dr. Griffin submitted a second assessment of work related activities. He then stated that Bond could lift only two pounds frequently, again with a ten pound maximum. Bond could stand or walk for only 20 minutes at a time and for a daily maximum of four hours and his ability to sit was similarly limited.
 
 
 17
 On January 16, 1988, Dr. Tepe stated that Bond was seriously depressed. He acknowledged that Bond received considerable help from a combination of psychotherapy and antidepressants which held Bond's suicidal thoughts at bay. Bond continued to have major depression and a dysthymic disorder. Dr. Tepe concluded that Bond desperately wanted to work and that his inability to work contributed to his psychological condition. Dr. Tepe stated that Bond satisfied the criteria of the Listing of Impairments (the "listings") for affective and anxiety disorders and equaled the listing for substance addiction disorders, 20 C.F.R.Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.09B.
 
 
 18
 On May 19, 1988, the Jewish Vocational Service performed a work evaluation on Bond at the request of the Administrative Law Judge ("ALJ"). The evaluator reported that Bond ambulated slowly and appeared stiff and overly cautious. His heel-to-toe gait appeared very shaky and he was unable to walk on his toes or his heels. He was unable to perform postural activities. Bond was focused consistently on his pain and he appeared significantly impaired by depression and feelings of hopelessness. He had tearful periods followed by suicidal ideation. He had problems relating to others and appeared angry and frustrated. He was unable to persevere at tasks. He had poor physical tolerance and a weak work pace. His emotional instability would have made him a poor candidate for cashiering or office work.
 
 
 19
 Dr. Samuel P. Todd, Jr., ("Dr. Todd") testified as a medical expert at an administrative hearing. He testified that Bond had gout and degenerative disc disease in his lower back. This disease could produce radicular pain if there were pressure on the nerve root, but Bond's bulging disc did not constitute objective evidence that he had such irritation. Bond's Babinski Test was normal, showing no nerve root degeneration. The medical evidence did not show whether the fusion of Bond's back was solid. A two-level fusion would cause a moderate impairment involving pain and a limitation of motion. There was not, however, indication of pressure on Bond's nerve root. Dr. Todd believed that Bond was unable to perform work as a roofer or work that involved excessive lifting or such postural activities as bending, stooping, or working in cramped quarters. Bond could perform light work based upon his orthopedic impairments. Dr. Todd determined that Bond could lift five to ten pounds. After the hearing, Dr. Todd reviewed the report of the Jewish Vocational Service. He stated that while it would be very difficult to find work for Bond, there was no orthopedic reason to find him incapable of performing light work.
 
 
 20
 Dr. Glenn M. Weaver ("Dr. Weaver") testified as a neuropsychiatric expert. He determined Bond had mild to moderate depression and an affective disorder, secondary to his back injury. Bond's condition did not meet or equal a listing. Bond satisfied the criteria for significant but not major depression. There was slight to moderate restriction in Bond's daily activities and social functioning. His answers to questions on psychological testing showed that he seldom had deficiencies in concentration. Bond's deficit in concentration was moderate in degree. The evidence was insufficient to show whether Bond had deterioration or decompensation in work or work-like settings. Dr. Weaver concluded that Bond's mental impairment was not incapacitating and it would not preclude Bond from performing light work. Dr. Weaver stated after the hearing that his opinion was not altered as a result of the Jewish Vocational Service report.
 
 
 21
 Dr. George Parsons ("Dr. Parsons") testified as a vocational expert. He classified Bond's roofing experience as heavy, semi-skilled work. Bond had knowledge of roofing and supervisory skills that would transfer to jobs such as roofing materials salesperson, personal property clerk, scheduler, estimator, telephone solicitor, property maintainer, and gate keeper. There were approximately 1200 such jobs in the region and 55,000 such jobs nationally. These were light and sedentary jobs that would require Bond to use his acquired skills and would not involve significant bending. After the hearing Dr. Parsons stated that the report of the Jewish Vocational Service indicated that Bond was disabled as of May 8, 1988, but not before.
 
 B.
 
 22
 On August 1, 1986, Bond filed his initial application for benefits. The application was denied on November 10, 1986. On January 15, 1987, Bond filed a request for reconsideration which was denied on July 1, 1987. On July 8, 1987, Bond filed a Request for Hearing. On January 20, 1988, a hearing was held before Administrative Law Judge Edward H. Tiley (the "ALJ"). On August 29, 1988, the ALJ issued a decision. The ALJ found that Bond had severe lower back pain and depression, but that he did not have an impairment or combination of impairments that met or equalled the listings. He found that Bond's testimony concerning the severity and extent of his illness was not fully credible. He determined Bond retained the residual functional capacity to perform light work, reduced by slight restrictions in his activities of daily living and social functioning. The ALJ concluded that there were significant numbers of jobs that Bond could perform and that Bond was, therefore, not entitled to a period of disability insurance benefits. On February 2, 1989, Bond's Request for Review of Hearing Decision was denied.
 
 
 23
 On March 27, 1989, Bond filed a Complaint for Review of the Secretary's Determination in the Southern District of Ohio. On April 20, 1990, a United States magistrate filed a Report and Recommendation that the Secretary of Health and Humans Services' (the "Secretary") decision be affirmed. On May 18, 1990, Bond filed objections to the report. On September 12, 1990, the district court entered judgment overruling those objections and adopting the Report and Recommendations of the magistrate. On October 22, 1990, Bond filed a timely Notice of Appeal.
 
 II.
 A.
 
 24
 We review the Secretary's findings only to determine whether they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)). In deciding whether the Secretary's findings are supported by substantial evidence, we must consider the record as a whole. Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980). The claimant must prove he or she became disabled before his insured status expired. Moon v. Sullivan, 923 F.2d 1175, 1182 (6th Cir.1990).
 
 
 25
 The regulations promulgated by the Secretary provide a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520 (1989). First, the Secretary must determine whether the claimant is currently engaging in substantial gainful activity. If not, the second inquiry is whether the claimant has a severe impairment or combination of impairments. If the claimant is severely impaired, the Secretary must compare the impairment to the listings. If the listings are not met, the Secretary must determine whether the impairments prevent the performance of the claimant's regular previous employment. If the claimant is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of producing evidence shifts to the Secretary to show that there is work in the national economy which the individual can perform. 20 C.F.R. § 404.1520; Lashley v. Secretary of Health & Human Servs., 708 F.2d 1048, 1053 (6th Cir.1983). To rebut a prima facie case, the Secretary must produce particularized proof of the claimant's individual capacity to perform alternate work considering the claimant's age, education, and background, as well as the job requirements. Moon, 923 F.2d at 1181.
 
 B.
 
 26
 Bond relies on two impairments to prove disability: back pain and depression. The ALJ determined that the first four steps of the sequential evaluation had been met. He determined Bond was not currently engaging in substantial gainful activity. Bond did suffer from a severe impairment or combination of impairments, but the impairments did not meet or equal a listing and Bond's impairments prevented him from performing his regular previous employment. Thus the ALJ determined that Bond had established a prima facie case of disability. The Secretary does not dispute this finding. The dispute on appeal is whether Bond's impairments are of a nature that they prevent him from performing work in the national economy. Bond maintains that he is limited to at most sedentary work based on his physical condition and that his depression makes it so that he is not capable of performing even sedentary work. The Secretary argues that Bond is capable of light work with some further limitations and that there are jobs that Bond could perform.
 
 
 27
 We examine a claim of disabling pain under the following test:
 
 
 28
 First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain.
 
 
 29
 McCormick v. Secretary of Health & Human Servs., 861 F.2d 998, 1002-03 (6th Cir.1988) (quoting Duncan v. Secretary of Health & Human Servs., 801 F.2d 847, 853 (6th Cir.1986), cert. denied, 461 U.S. 957 (1983)).
 
 
 30
 The Secretary concedes that Bond presented objective evidence of an underlying spinal condition. There is substantial evidence, however, to support the Secretary's finding that the underlying condition is not of a severity that could reasonably be expected to cause disabling pain. Clinical findings in Bond's case are overwhelmingly normal. His muscle strength and motor power were unimpaired, his reflexes were intact, and he had no sensory abnormalities. His range of motion was intact and he had no abnormalities of gait. His lack of atrophy demonstrated his ongoing ability to use his musculature.
 
 
 31
 Bond argues that the testimony of Dr. Griffin establishes that objective evidence confirms the severity of the pain or indicates that the severity of pain that can reasonably be expected is disabling. We have recognized that the opinion of a treating physician is ordinarily entitled to deference, but only when that opinion is supported by detailed clinical, diagnostic evidence. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir.1985). The diagnostic evidence in this case does not support a finding of disability. The report of Bond's surgery showed bone overgrowth, but no actual disc herniation or pathology affecting the nerve root. Dr. Griffin reported that pressure had built up on the dura, but there is no showing that the nerve itself had been affected. After Dr. Griffin relieved this pressure, there is no showing that Bond had re-formed any structure capable of affecting the nerve.
 
 
 32
 Dr. Griffin noted in May 1987 that the most recent x-rays had indicated an incomplete healing of the lumbar fusion mass. Transcript at 241. There was no assessment of the degree of incompleteness in the healing process nor any indication that the fusion's state of healing had produced any neurological consequences. Moreover, although the record shows no definite evidence that the fusion healed fully, it is inferable that healing of the fusion site did ultimately occur. Dr. Griffin was not required to perform further surgery and made no mention of incomplete fusion in either of the residual functional capacity assessments he completed in 1988. To the contrary, Dr. Griffin speculated about the possible breakdown of the fusion site, indicating that the site had in fact fused. Transcript at 275. Dr. Griffin's postsurgery evaluation was remarkably normal. There were no neurological abnormalities. Bond was able to walk on his heels and toes, rise from a squat, and walk normally without an ambulation aid. His strength was intact in all relevant muscle groups.
 
 
 33
 There was no objective evidence in Dr. Griffin's report to support the limitations he stated. Dr. Griffin relied at least in part on nerve root irritation at disc space but there was no evidence that Bond had such irritation. Dr. Griffin speculated as to future deterioration of Bond's fusion site, but speculation of future deterioration can not establish present disability. Stille v. Weinberger, 499 F.2d 244, 247 (6th Cir.1974).
 
 
 34
 Dr. Todd, whom Bond relies upon in his brief, twice stated that Bond could perform light work. Transcript at 58, 315. Thus, we conclude that substantial evidence supports the Secretary's finding that Bond's physical impairments did not leave Bond disabled.
 
 C.
 
 35
 Bond argues that even if his back pain alone does not leave him disabled, he is disabled when his depression is also considered. The Secretary argues, and we agree, that the Secretary's finding of no disability is supported by substantial evidence even when Bond's mental impairments are considered.
 
 
 36
 The psychological evidence shows that Bond was oriented to time, place and person and that he was in good contact with reality. Transcript at 233, 248. His intellectual functioning including IQ and ability to perform abstract reasoning was in the average range. Transcript at 234, 248. Both Doctors Tepe and Farrell gave inconsistent appraisals of Bond's memory. They each report memory difficulties. Dr. Tepe concluded, however, that Bond's memory, despite some deficits, was preserved "in a more global sense." Transcript at 234. Dr. Farrell reported both that there is no evidence of any significant memory impairment, Transcript at 248, and that results of the clinical interview suggest a significant memory impairment, Transcript at 249. Dr. Farrell noted that Bond had a fair to good ability to understand, remember, and carry out simple instructions and that "he should have no difficulty performing routine and repetitive tasks." Transcript at 251. Dr. Weaver, the medical expert, also concluded that Bond's mental impairment was insufficient to preclude him from working. Transcript at 70, 77-81. We, therefore, conclude that substantial evidence supports the Secretary's finding that Bond is not disabled even when Bond's mental impairments are considered along with his physical impairments.
 
 D.
 
 37
 The Secretary sufficiently demonstrated the availability of jobs in the national economy that Bond could perform. Bond places much emphasis on the testimony of Dr. Parsons, the vocational expert. Bond argues that Dr. Parsons' testimony indicated that there were not a significant number of jobs in the economy that he could perform. Bond misconstrues Dr. Parsons' testimony. Dr. Parsons testified that if Dr. Farrell's report were read to establish a significant reduction in an ability to concentrate, then Bond would have problems initially entering into the work force. Transcript at 89-90. Dr. Parsons did not, however, testify that Bond had concentration difficulties which would preclude all employment. Dr. Parsons did not base his testimony only on the selected portions of Dr. Farrell's report identified by Bond's attorney. He relied on the entirety of Dr. Farrell's report and on the testimony of medical experts, Doctors Todd and Weaver. Based on a hypothetical question incorporating the opinions of these two experts, Dr. Parsons testified that there were jobs existing in the national economy that Bond could perform. Dr. Farrell stated that Bond appeared to have a good understanding of simple oral and written instructions. In his conclusion, Dr. Farrell stated that Bond's "attention and concentration appear[ ] in the average range and he should have no difficulty performing routine and repetitive tasks." Transcript at 251. There was, therefore, substantial evidence to support the Secretary's finding of no disability. It is irrelevant that portions of Dr. Farrell's report would have supported a different conclusion. See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir.1986).
 
 III.
 
 38
 For the foregoing reasons, we AFFIRM the decision of the Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio.
 
 
 
 *
 The Honorable Paul V. Gadola, United States District Judge for the Eastern District of Michigan, sitting by designation