Mary Louise HARRIS, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 00–72006.

United States District Court,
E.D. Michigan,
Southern Division.

March 20, 2001.

Mary Beth Black, Port Huron, MI, for Mary Louise Harris, plaintiff.

Geneva S. Halliday, United States Attorney's Office, Detroit, MI, for Social Security, Commissioner of, defendant.

### OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

ROSEN, District Judge.

On February 7, 2001, Magistrate Judge Wallace Capel, Jr. issued a Report and Recommendation ("R & R") recommending that the Court deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment. Plaintiff filed objections to the R & R on February 20, 2001. The Court has now reviewed the parties' motions, the R & R, Plaintiff's objections, and the other materials in the record. For the reasons discussed briefly below, the Court agrees with the thorough analysis of the Magistrate Judge, and adopts the R & R in its entirety.

Although Plaintiff purports to set forth seven separate objections to the R & R, her principal complaint appears to be that the Magistrate Judge did not fully consider the entire medical record in concluding that the medical evidence fails to support Plaintiff's allegations of disabling conditions during the relevant time period in late 1993. For example, Plaintiff cites her treatment for injuries suffered in an automobile accident in 1986, and her physician visits dating back to 1981 for treatment of back pain.

Upon independent review of the R & R in light of the administrative record, however, this Court cannot agree that the Magistrate Judge overlooked any medical evidence in determining that the ALJ's decision is supported by substantial evidence. To the contrary, the Magistrate Judge thoroughly and painstakingly reviewed the entirety of Plaintiff's lengthy medical record, and aptly observed that it fails to sustain Plaintiff's claims of disabling conditions. While it is apparent that Plaintiff has been treated for various conditions over the years, and that she has suffered from some degree of pain in her back, neck, arm, and shoulder, the Magistrate Judge identified three specific bases for concluding that this evidence is insufficient to overturn the ALJ's decision: (i) the lack of objective medical findings that any of Plaintiff's impairments rose to the level of a disabling condition; (ii) Plaintiff's reliance on only over-the-counter medication to treat her pain during the relevant period; and (iii) the inconsistency between Plaintiff's claims of disabling pain and other severe impairments, on one hand, and her reports of her various, often vigorous activities, on the other. The Court finds that this comprehensive analysis belies Plaintiff's claim that the R & R failed to account for the entire medical record.

Accordingly, for these reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Magistrate Judge's February 7, 2001 Report and Recommendation is ADOPTED in its entirety.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is DENIED, and that Defendant's Motion for Summary Judgment is GRANTED.

### REPORT AND RECOMMENDATION

CAPEL, United States Magistrate Judge.

### I. RECOMMENDATION

It is recommended that the Court deny Plaintiff's Motion for Summary Judgment,

grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

## II. REPORT

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits ("DIB"). Plaintiff filed for benefits on September 20, 1994, alleging that she became disabled on December 18, 1993, due to back, neck, hand, and arm pain. (Tr. 25, 51).[1] The Social Security Administration ("SSA") denied benefits initially and upon reconsideration. (Tr. 31–40). A *de novo* hearing was held on October 25, 1996, before Administrative Law Judge ("ALJ") John Hammerly. (Tr. 299–328). In a written decision on December 10, 1996, ALJ Hammerly found that although Plaintiff had residuals from cervical and left shoulder strain and could not perform her past work, she retained the residual functional capacity ("RFC") to perform the full range of light work save jobs requiring overhead use of her left upper extremity. (Tr. 197–201). On June 20, 1998, the Appeals Council vacated ALJ Hammerly's decision and remanded the case for further evaluation of vocational evidence and Plaintiff's subjective complaints.[2] (Tr. 206–208). On October 19, 1999, Plaintiff appeared with counsel and testified before ALJ Lubomyer Jacknycky. (Tr. 329–376). In a written decision on October 28, 1999, ALJ Jacknycky denied Plaintiff's application,

finding that prior to December 31, 1993, Plaintiff had been unable to perform her past work but retained the RFC to perform a limited range of sedentary and light work. (Tr. 6–21). Accordingly, Plaintiff was found not disabled. The Appeals Council denied review, and Plaintiff commenced this action for judicial review.

### A. PLAINTIFF'S TESTIMONY[3]

The Plaintiff was born on May 9, 1948, has an eighth grade education, and resides in Port Huron, Michigan. (Tr. 333, 334). Her past relevant work includes employment as a cosmetologist and "cook." (Tr. 365). At the time of her onset date, Plaintiff was laid-off from her cooking job at a country club during a "minor shut[-]down" in late December 1993. (Tr. 336, 340). She returned to work at the country club within three weeks when a "new manager" was hired. (Tr. 336, 337, 339–340). Plaintiff testified that she worked until February 1994, when she injured her back and neck lifting a "big pan of spaghetti" and had to quit. (Tr. 337, 350). Her primary duties were to prepare lunches and to do "prep" work for dinners. (Tr. 341). She was required to lift ten pounds or less. (Tr. 338). Plaintiff was employed as a cook for three years. (Tr. 338–339).

During 1993 and 1994, Plaintiff would get out of bed at 6:00 a.m. (Tr. 341). Her work hours varied at the country club, but were often from 9:00 a.m. to 3:00 p.m. (Tr. 340–342). She was independent in the ac-

1. Plaintiff's insured status expired on December 31, 1993. (Tr. 41). In order to qualify for benefits, Plaintiff was required to establish that she was disabled on or before the date of termination of her insured status. 20 C.F.R. § 404.131(b)(1); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir.1990).

2. The Appeals Council's order to vacate and remand was based on two perceived errors: (1) ALJ Hammerly "did not summarize or

evaluate the testimony of the vocational expert in [his written] decision"; and (2) ALJ Hammerly "failed to specify and evaluate the [Plaintiff's] daily activities" and [made] "conclusory statement(s) [in the written decision] without supporting rationale." (Tr. 207).

3. My summary is limited to Plaintiff's testimony taken before ALJ Jacknycky pursuant to the Appeals Council's order of June 1998.

tivities of daily living ("ADLs"); able to dress herself and maintain her personal hygiene. *Id.* Plaintiff also testified that she performed all the household chores, which included "wash[ing] walls, floors, [ ] laundry, vacuum[ing], swe[eping], [and] clean[ing]." (Tr. 341). She testified "I did it all" in response to the ALJ's question of whether she cooked for the entire household. *Id.* Plaintiff explained that her husband and daughter helped with chores "on occasion," but "basically the house[hold] [responsibilities] w[ere] mine." (Tr. 342).

When not at work, Plaintiff testified that she attended her daughter's softball games three to five times per week in the spring and summer. *Id.* She also enjoyed attending "horse sales," "auction sales," or "just [ ] visit[ing] friends." *Id.* As to hobbies, Plaintiff enjoyed "needlework," "build[ing] things" such as birdhouses or "benches," and "strip[ping] furniture." (Tr. 343). She testified that she last performed needlework in mid–1999, last performed woodworking in 1998, and has not "stripped furniture" since 1997. *Id.* She still enjoys visiting with friends a "couple times a week." *Id.*

Regarding her alleged impairments, Plaintiff primarily testified to disabling pain in her left shoulder, right arm, neck, and lower back. (Tr. 343–363). Plaintiff first testified that in 1968, she suffered "damage" to her right arm in an automobile accident. (Tr. 343–344). Her right arm had constant pain during prolonged use. (Tr. 344). She testified that the pain "gives me trouble still," but admitted that with therapy and home exercises she is now able to "cope." *Id.* During the insured period, Plaintiff estimated that she would have "a hard time" picking up twenty pounds. (Tr. 345). She testified to having back and neck "strain," and left shoulder pain due to another automobile accident in 1986. (Tr. 346). Plaintiff esti-

mated her neck and shoulder pain during the 1990's was a 6 on a 10 scale. (Tr. 347). As to low back pain, she testified to having had "pinched nerves" and radiating leg pain causing difficulty walking. *Id.* She rated her back pain in 1993 as a 9 on a 10 scale. (Tr. 348). When asked about treatment for her back pain, Plaintiff testified that her doctor advised to "lay off and be easy and use compresses." (Tr. 347). With regard to mental impairment, Plaintiff testified that she was hospitalized in 1991 after an overdose. (Tr. 348). She has had no follow-up psychiatric treatment. (Tr. 349). Plaintiff testified that she has not had subsequent psychological problems other than depression. *Id.* She has not been prescribed nor is she taking psychiatric medications. *Id.*

Plaintiff testified that her physical condition since 1993 has "gotten worse." *Id.* She described radiating back, neck and shoulder pain after she injured herself at her cooking job in 1994. *Id.* As stated, she quit her job in February 1994 due to the pain. (Tr. 350). Plaintiff admitted her neck pain as "much worse" after February 1994; she estimated it to be a 10 on a 10 scale of severity. (Tr. 351). She has not worked since. *Id.* Plaintiff wore a neck brace at the hearing. (Tr. 352). She testified that she has had the brace for six months. *Id.* Plaintiff also testified to residual right hip "problems" from the 1968 accident. *Id.* She has a "tendency to fall on occasion." *Id.* Plaintiff testified to having "cysts" on her hands. (Tr. 353). Her hands "ache" and "throb." *Id.* She testified that "some days" she cannot read her own handwriting. *Id.* The condition has worsened in the last year. (Tr. 354). Plaintiff testified that, in the last two years, headaches from "neck pressure" prevent her from sleeping at night. (Tr. 354).

As to RFC during the insured period, Plaintiff testified that she had to stand throughout her six hour shift at the country club. (Tr. 356). She rarely sat down. *Id.* Plaintiff was able to lift items that were fifteen pounds or less. *Id.* She had fine manipulation and simple grasping ability, but had problems with grip strength as when chopping vegetables. *Id.* She also testified that her ability to bend and squat varied depending on her condition. (Tr. 357). Plaintiff testified that these exertional abilities diminished after her February 1994 accident due to neck pain. *Id.* "[E]xcruciating" neck pain prevented Plaintiff from doing exertional activities for "quite some time." (Tr. 358). Plaintiff testified that even a year later, in February 1994, she "was better" but explained "I've never been like I was in 1993." *Id.* She took Tylenol for pain in 1993. (Tr. 362).

## B. *MEDICAL EVIDENCE*

### 1. Medical Evidence Prior to December 18, 1993

Plaintiff's treatment records primarily show a history of complaints of intermittent back, neck, arm, and shoulder pain. (Tr. 67–73, 94–98). I summarize the record of her alleged impairments below.

Records from C.O. Townley, M.D., show Plaintiff reported in December 1981 that she has had back pain since 1976. (Tr. 67). On examination, Plaintiff exhibited good muscle strength, positive straight leg raises to 90 degrees, with low back and bilateral leg pain. *Id.* In December 1981, Plaintiff complained of "trouble in both legs"; she was advised to discontinue work if necessary. (Tr. 68). In September 21, 1982, Plaintiff had "a recurrence of low back pain." *Id.* Dr. Townley's office again advised her to take time off work. *Id.* On examination in October 1982, Dr. Townley's office noted that "Plaintiff is a lot

better"; an electromyogram revealed no nerve root irritation at L4–L5. *Id.*

Plaintiff was examined by Michael Sutton, D.O., in November 1983, for complaints of back and neck pain. (Tr. 94). Dr. Sutton noted that Plaintiff was "doing fairly well." *Id.* He stated that "back films" show no change in her condition from 1981. *Id.* Also, he noted that she "will remain active" and "call if she is having trouble." *Id.* In July 1985, Plaintiff was examined by Dr. Sutton for complaints of right arm pain. (Tr. 95). He diagnosed arm pain of unknown origin and prescribed an anti-inflammatory for relief. *Id.* After a "fall" in January 1986, Plaintiff returned to Dr. Sutton with complaints of back pain. *Id.* He opined that Plaintiff may have nerve root compression. *Id.* She resumed Empirin and Flexeril and was prescribed physical therapy ("P.T."). *Id.*

In April 1986, Plaintiff suffered whiplash injuries in a car accident. (Tr. 156). Hospital records show that Plaintiff exhibited fuzzy vision, mild distress and discomfort, painful range of motion ("ROM") of the cervical spine with localized tenderness of the trapezium muscle. (Tr. 156). X-rays of Plaintiff's cervical spine were normal. (Tr. 158). She was diagnosed with acute cervical sprain. (Tr. 155).

Plaintiff returned to Dr. Sutton in April with neck pain complaints. (Tr. 96). On examination, Dr. Sutton noted "no specific findings other than some tenderness in the neck." *Id.* He noted that her x-rays were normal and treated her for a flexion extension sprain. *Id.* Five days later, Dr. Sutton granted Plaintiff a release from her cosmetologist job due to neck pain. *Id.* Her complaints of work-generated neck pain continued throughout May 1986. *Id.* Dr. Sutton again started Plaintiff on P.T. and "put her in a [cervical] collar." *Id.* On examination in June 1986, Dr. Sutton not-

ed that Plaintiff had "somewhat improved" but continued to have neck stiffness. (Tr. 97). In July 1986, Dr. Sutton noted that Plaintiff had been cleared to return to work. *Id.* On examination in September 1986, Plaintiff exhibited residual symptoms that Dr. Sutton described as "not significantly bad." *Id.* He noted that Plaintiff was making "satisfactory progress." *Id.*

In March 1987, Plaintiff returned to Dr. Townley's office with complaints of neck, left shoulder, and elbow pain radiating to her left hand. (Tr. 69). X-rays of her left shoulder were unremarkable. *Id.* X-rays of her cervical spine showed C5 mild disc space narrowing and anterior spur formation. *Id.* Plaintiff had a full ROM of the cervical spine, left shoulder, and left hand. *Id.* She was diagnosed with cervical strain "superimposed with early cervical 5 degenerative disc disease" and "mild left shoulder rotator cuff syndrome." *Id.* She was prescribed 200 m.g. of Clinoril and told to use a heating pad on her neck. *Id.* In May 1987, Plaintiff returned to Dr. Townley's clinic with complaints of neck pain and headaches. (Tr. 70). On examination, Plaintiff had full ROM of the cervical spine and left shoulder, and had no numbness of the upper extremities. *Id.* She agreed to return to work as a cosmetologist three times per week. *Id.* Plaintiff was advised on a work-hardening program for grip strength and cervical ROM. *Id.*

In July 1987, Dr. Townley's office noted Plaintiff's left shoulder symptoms were "nearly completely resolve[d]." (Tr. 70). She had "some residual stiffness" on ROM of the neck. *Id.* Her work-strengthening program was continued. *Id.* On follow-up in January 1988, Plaintiff complained of intermittent neck "ache[s]" and occasional headaches. *Id.* She presented no right arm and minimal left shoulder symptoms. *Id.* Examination revealed full left shoulder ROM with mild anterior tenderness to pal-

pation and normal cervical ROM with base neck stiffness. *Id.* Plaintiff was continued on Clinoril. *Id.* She was also advised to avoid overhead work and heavy lifting. *Id.* In April 1988, Plaintiff again complained of neck pain and radiating arm pain. (Tr. 71). On examination, she had normal cervical posture, rotation to 80 degrees left, 90 degrees right, with unremarkable neurological findings. *Id.* She was diagnosed with chronic cervical strain and cervical disc syndrome. *Id.*

In August 1988, Plaintiff was examined by Dr. Townley's clinic for complaints of right hip pain. *Id.* Plaintiff's "neck status" was unchanged. *Id.* She had occasional numbness in the left hand, but no evidence of carpal tunnel syndrome ("CTS"). *Id.* A spinal x-ray showed mild facet arthritic narrowing at 5–1. *Id.* The diagnosis was lumbar disc syndrome and L5–S1 facet syndrome. *Id.* She retained the diagnosis of chronic cervical strain and left shoulder rotator cuff syndrome. *Id.* In December 1988, Plaintiff presented for examination with complaints of neck aches and low back pain. *Id.* On examination, Plaintiff had full ROM of the left shoulder, near full ROM of the cervical spine, a left lateral neck ache and shoulder discomfort on extremes of rotation. *Id.* She had point tenderness in the anterior aspect of the rotator cuff, performed straight leg raises to 90 degrees, and had "good" heel-toe gait. *Id.* Plaintiff was diagnosed with rotator cuff syndrome. *Id.* In April 1989, Plaintiff again complained of neck pain. (Tr. 72). As before, her cervical ROM was "nearly complete," but she had neck aches on extremes of rotation and extension. *Id.* An x-ray of the cervical spine revealed C5 flexion dysrhythmia and mild narrowing of the C5 disk. *Id.* She was continued on Naprosyn and advised to perform cervical ROM exercises. *Id.*

Plaintiff returned to Dr. Townley's clinic on follow-up for neck aches in January 1990. *Id.* On examination, she had a "[n]ear full ROM, but exhibited stiffness with rotation at 80 degrees. *Id.* She was diagnosed with chronic cervical strain and a ganglion cyst on her right wrist". (Tr. 73). In April 1990, Plaintiff sought follow-up treatment for the cyst on her right hand. *Id.* Her symptoms had subsided, the cyst had resolved, and there was no longer a lump. *Id.* Plaintiff was advised to continue proper cervical posture and strength exercises. *Id.*

In February 1991, Plaintiff was admitted to the hospital for a medication overdose. (Tr. 127–128). Attending physician, T. Bahhur, M.D., noted that Plaintiff was diagnosed by a staff psychiatrist as suffering from an adjustment disorder involving mixed emotional features. (Tr. 127). She was discharged on the same day "in good condition" and directed to follow-up with psychiatry on an outpatient basis. *Id.*

In March 1992, Plaintiff returned to Dr. Sutton complaining of pain and swelling of the right wrist. (Tr. 100). X-rays revealed a "slight" ganglion cyst. *Id.* Dr. Sutton successfully removed the cyst in mid-March 1992. (Tr. 100–101). Due to difficulty flexing the wrist, Plaintiff was referred for P.T. (Tr. 100). Physical therapist, Rob Brickley, P.T., in an April 1992 report, indicated that Plaintiff complained of reduced extension, flexion and edema of the wrist. (Tr. 102). For treatment, he reported that Plaintiff would receive therapeutic exercises, muscle stimulation, massage and contrast. *Id.* He assessed Plaintiff as having good rehabilitation potential. *Id.*

Plaintiff returned to Dr. Sutton in August 1992 with complaints of recurrent back pain. (Tr. 100). On examination, Plaintiff could bend at the waist to 90 degrees, bend laterally on rotation without restriction, heel/toe walk "well," with "good patellar and Achilles reflexes." *Id.* Plaintiff had good extensor strength. *Id.* Straight leg raises were positive on the left side. (Tr. 103). X-rays were "indicative of spasm." *Id.* Dr. Sutton placed her on 300 m.g. of Flexeril and Lodine. *Id.* He also recommended a course of P.T. *Id.*

In late-August 1992, Plaintiff was also seen by Dr. Townley's clinic on similar complaints. (Tr. 72). On examination, Plaintiff exhibited negative straight leg raises on the right, 80 degrees positive on the left, "good" heel/toe gait; full range of "back full flexion," extension to 20 degrees and lateral bending to 20 degrees. *Id.* An x-ray of Plaintiff's lumbosacral spine revealed mild narrowing of the L5 disc and 5–1 facet arthrosis, "mildly so at 4–5 facets." *Id.* Plaintiff was diagnosed with L5 disc syndrome, radiating pain in the left leg and facet hypertrophy of L4–5 bilaterally. *Id.*

Plaintiff presented to Dr. Townley's clinic for "low back ache" in February 1993. (Tr. 74). She reported subsiding pain in the last six weeks. *Id.* On examination, bilateral straight leg raises were negative; an x-ray of the lumbosacral spine showed 5–1 facet arthrosis. *Id.* Plaintiff was diagnosed with L5–1 facet syndrome. *Id.*

**2. Medical Evidence During the Focus Period: December 18, 1993 until December 31, 1993**

There are no medical records pertaining to Plaintiff's allegedly disabling impairments during the relevant period.

**3. Medical Evidence After December 31, 1993**

In January 1994, Plaintiff was examined at Dr. Townley's clinic for complaints of neck aches radiating to the left shoulder. (Tr. 76). Her symptoms increased when

she scrubbed her kitchen floor. *Id.* On examination, Plaintiff had normal cervical posture, right rotation to 90 degrees, extension to 20 degrees, flexion to 50 degrees, normal neurological ROM, and mild muscle spasm of the left trapezium muscle. *Id.* She was diagnosed with degenerative disc disease at C5. (Tr. 77).

In February 1994, Plaintiff sought outpatient treatment at Physician's Health Care Network ("PHCN") for neck and left shoulder pain. (Tr. 175). X-rays showed "minimal degenerative changes" in the cervical spine at C5–6 and a normal left shoulder. (Tr. 75, 187). She was prescribed Darvocet and released from work for four to five days. (Tr. 175). Follow-up examinations in late February and early March show that Plaintiff was "feeling better" but still had some neck pain. (Tr. 171–174).

Plaintiff returned to Dr. Townley's office in April 1994, with complaints of increased neck aches radiating into the left arm. (Tr. 74, 185). Plaintiff reported that she had lost her job due to aching in her neck and arm. *Id.* Examination revealed that her cervical ROM was 90 degrees on right rotation, 75 degrees left with stiffness; 10 degrees extension; full flexion; with left trapezius pain to palpation. *Id.* Plaintiff was diagnosed with C–5 disc syndrome of the cervical spine. *Id.* In June 1994, Plaintiff presented to Dr. Townley's office with complaints regarding her left heel. *Id.* X-rays of her left heel revealed a calcaneal spur. (Tr. 74–75). Plaintiff was treated with a local injection. (Tr. 74). Hexadrol and Relafen were prescribed. *Id.* Plaintiff was advised to continue using a heel pad. (Tr. 74).

In early December 1994, Plaintiff presented to PHCN with complaints of neck and shoulder pain recurrent from February 1994. (Tr. 169). She was diagnosed with acute cervical strain; cervical disc disease was ruled out. *Id.* In mid-Decem-

ber 1994, Plaintiff returned to PHCN with complaints of mid-back and left shoulder pain. (Tr. 167). On examination, Plaintiff had mid-thoracic and trapezial muscle tenderness. *Id.* However, she had full ROM of cervical spine, no edema, no ecchymosis, normal strength, normal sensation, and equal deep tendon reflexes. *Id.* Plaintiff was diagnosed with acute thoracic and trapezial strain. *Id.*

Records from Plaintiff's attorney from July 1996 show that Plaintiff dropped a drill on her right foot in June 1996. (Tr. 193). An x-ray of the right foot was negative. *Id.* Plaintiff was diagnosed with a right foot contusion and tendinitis. *Id.* Additional records from Plaintiff's attorney reveal that Plaintiff was carrying a "20 pound steel window fan," which she also dropped on her right foot in August 1996. *Id.* An X-ray of the right foot revealed no evidence of fracture. *Id.* Plaintiff was diagnosed with a contusion, nerve inflammation, and bottom foot pain. *Id.*

In October 1996, Plaintiff sought treatment with Edward J. Nebel, M.D., for right elbow pain caused by washing windows. (Tr. 237). An x-ray of the right elbow was negative. *Id.* Lodine was prescribed and she was given a splint and elbow band. *Id.* In February 1997, Plaintiff was again examined by Dr. Nebel. *Id.* Plaintiff complained of right knee, right foot, right hip, and right leg "symptoms" and numbness. *Id.* Dr. Nebel noted that Plaintiff was a "hard working lady." *Id.* Examination revealed bursitis in the right knee, dorsum right foot palpation, and mild ganglion cyst symptoms in her right ring finger. *Id.* Straight leg raises were negative. *Id.* Dr. Nebel discussed "proper exercise precautions" with Plaintiff. *Id.*

In June 1997, Dr. Nebel examined Plaintiff for complaints of pain after she "struck" her knees on a wood floor. (Tr. 238). Examination revealed prepatellar

contusion type bursitis in both knees. *Id.* X-rays of both knees were normal. *Id.* Plaintiff was diagnosed with post prepatellar and patellar tendon contusion with traumatic bursitis. *Id.* She returned to Dr. Nebel in August 1997, for complaints of right arm pain and inability to "lift." *Id.* Examination revealed rotator cuff tendinitis with no instability. *Id.* An x-ray of Plaintiff's right shoulder revealed calcification from a "previous humerus fracture." *Id.* She was diagnosed with right shoulder strain and rotator cuff tendinitis. *Id.*

In February 1998, Dr. Nebel examined Plaintiff for right shoulder symptoms. (Tr. 239). On examination, Plaintiff had an aching right arm and shoulder with ROM point tenderness, rotator cuff abduction was 90 degrees, flexion was 110 degrees. (Tr. 239). The shoulder was stable and her acromioclavicular joint ("AC") was negative. *Id.* She exhibited normal cervical posture and rotation with "mild" symptoms on extreme extension. *Id.* Examination of Plaintiff's right hand revealed carpometacarpal joint ("CJ") degenerative joint disease ("DJD"). *Id.* Accordingly, Dr. Nebel diagnosed right hand CMC DJD, right hand CTS sub clinical, and cervical disc syndrome. *Id.*

In early July 1998, Plaintiff returned to Dr. Nebel for left shoulder symptoms after she fell in her barn. (Tr. 240). On examination, Plaintiff's left AC had palpitation, sore anterior and posterior left rotator cuff, stable shoulder, and intact deltoid. *Id.* Left shoulder ROM was only slightly restricted. *Id.* Dr. Nebel diagnosed left shoulder contusion, rotator cuff syndrome with impingement, and cervical strain. *Id.* Plaintiff elected to have right shoulder surgery. *Id.* In mid-July, Dr. Nebel performed a partial acrominonectomy and repaired her torn rotator cuff. (Tr. 256–258).

On follow-up with Dr. Nebel in August 1998, Plaintiff exhibited mild symptoms across the clavicle neck area. (Tr. 241). X-rays of Plaintiff's left shoulder were normal. (Tr. 241). Dr. Nebel diagnosed mild cervical disc syndrome. *Id.* In October 1998, Dr. Nebel again saw Plaintiff on follow-up. *Id.* On examination, Plaintiff had full ROM, no instability, and her pain was "much better." *Id.* Dr. Nebel diagnosed Plaintiff as status post-surgery with a history of cervical degenerative disc disease. *Id.*

Plaintiff participated in P.T. by referral from Dr. Nebel. Record summary of her P.T. shows that between August and October 1998, Plaintiff complained of severe right shoulder pain (9 on a pain scale of 10), reduced ROM of the right shoulder, and limited use of her right arm. (Tr. 246–251, 274–283). On discharge, Plaintiff had exhibited a significant improvement in right shoulder pain, right shoulder ROM, and household ADLs. (Tr. 251).

In December 1998, Plaintiff presented to Dr. Nebel with complaints of right shoulder pain and symptoms of a right thumb joint cyst. (Tr. 242). On examination, Plaintiff exhibited right shoulder AC joint synovitis and full ROM, but had right arm adduction and pain on rotation at the AC joint. *Id.* Dr. Nebel diagnosed right shoulder AC joint with DJD, joint arthritis in the left and right hand, a right thumb joint ganglion with mild synovitis, and a ganglion on the right wrist tendon. *Id.* On follow-up in December 1998, Plaintiff presented shoulder symptoms. (Tr. 243). Dr. Nebel diagnosed Plaintiff's right shoulder AC with DJD. *Id.* In late-December 1998, Plaintiff again presented right shoulder pain. *Id.* On examination, Plaintiff exhibited a near full ROM in the right shoulder, with only mild AC joint symptoms. *Id.* Right shoulder long head biceps pain was detected. *Id.* Dr. Nebel diag-

nosed right shoulder biceps tendinitis, rotator cuff tendinitis, cervical degenerative disc disease, and DJD of the right shoulder AC joint. *Id.*

In January 1999, Plaintiff requested Dr. Nebel perform right shoulder surgery to address biceps tendinitis and AC joint DJD. (Tr. 244). Dr. Nebel noted a ninety-five percent (95%) chance of a good functional result from surgery. *Id.* In late January 1999, Dr. Nebel performed a right shoulder AC joint arthroplasty with excision of the distant clavicle and a tenodesis on the biceps tendon of the right shoulder. (Tr. 253–254, 264–273). On follow-up in February 1999, Dr. Nebel noted that Plaintiff was status post-biceps tenodesis. *Id.* X-rays showed excellent alignment, and her AC joint was "doing well post resection." (Tr. 245). Plaintiff was directed to abstain from lifting objects with her right hand and to "gently progress" into extension and flexion exercises. *Id.*

## C. *VOCATIONAL EXPERT'S TESTIMONY* [4]

James M. Fuller, a vocational expert ("VE"), also testified at the hearing. (Tr. 364–375). He classified Plaintiff's previous employment (chef and cosmetologist) as skilled and performed at the light exertional level. (Tr. 233, 364–369). ALJ Jacknycky presented a hypothetical question to the VE assuming that a claimant with Plaintiff's age, education, and work experience suffered from the symptoms described by Plaintiff with the following capabilities and limitations: ability to do simple hand grasping and fine manipulation; lift ten pounds occasionally; bend, stoop, and squat occasionally; sit, stand, and walk six hours in an eight hour day; no kneeling, crouching or crawling; no exposure to climbing steps, ladders or scaffolds; no reaching above shoulder level; no power gripping or firm hand grasping; no heights or moving machinery; and no work involving more than 4–5 step job instructions. (Tr. 371–372). The VE testified that Plaintiff would be able to perform a range of sedentary [5] and light [6] unskilled work. (Tr. 372). He stated jobs in these categories existed in the following types and numbers in the regional economy: assembler, 4,000; packager, 5,000; inspector, 4,000; security guard/monitor, 4,000; retail counter clerk, 4,000; and cashier, 10,000. (Tr. 372–375).

## D. *ALJ'S CONCLUSIONS*

After reviewing the testimony and record medical evidence, ALJ Jacknycky found that Plaintiff suffered from degenerative arthritis of the cervical and lumbar spine, depression and pain but that she did not have an impairment listed in, or medically equal to one listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 13). The ALJ found Plaintiff's testimony of pain, limitations and restrictions not fully credible. (Tr. 15). He determined that prior to December 31, 1993, Plaintiff had the RFC

---

**4.** Again, my summary is limited to the testimony taken before ALJ Jacknycky pursuant to the Appeals Council's order of June 1998.

**5.** Sedentary work involves lifting no more than ten pounds at a time with frequent lifting or carrying of articles like docket files, ledgers, or small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

**6.** Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves some pushing or pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

to perform a restricted range of unskilled light and sedentary work as described above. Accordingly, the ALJ concluded that Plaintiff was not disabled.

## E. ANALYSIS

The Plaintiff essentially contends in her Motion that substantial record evidence does not support the ALJ's conclusion that she is capable of performing a restricted range of sedentary and light unskilled work. This Court's review of the ALJ's conclusions is limited. The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g)(1997). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997). It is more than a scintilla of evidence but less than a preponderance of evidence. *Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989)(citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if supported by substantial evidence. *Walters*, 127 F.3d at 528; *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986)(quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)).

Substantial evidence exists to support the ALJ's conclusion that Plaintiff retained the RFC to perform the restricted range of unskilled sedentary and light work between December 18 and December 31, 1993. The objective medical evidence prior to December 31, 1993, shows that Plaintiff complained of depression and pain in her back, neck, right arm, left shoulder, right hip and right wrist. However, the medical evidence does not support Plaintiff's allegation that these conditions were disabling at that time. The record contains no relevant medical evidence that relates to the contemporaneous period. More specifically, there is no evidence that Plaintiff sought medical treatment for any of the above impairments from February 1993 until February 1994, when she injured her back and neck in the post-expiration period after having resumed her cooking job at a country club.

The medical record does not even establish disability prior to February 1994. There is no evidence of psychological problems or treatment in the record after Plaintiff's overdose in February 1991. Complaints of right arm pain were isolated to July 1985, and do not resurface in the record until August 1997. (Tr. 69, 238). Cysts causing her wrist and hand symptoms in January 1990 and March 1992 were removed. No additional evidence of hand-related symptoms exists until December 1998.[7] Plaintiff's left shoulder pain between March 1987 and December 1988, was diagnosed as mild rotator cuff syndrome. X-rays of her shoulder were normal, and she had a full ROM. Complaints of left shoulder pain do not re-emerge until January 1994. (Tr. 76). Plaintiff's neck pain between April 1986 and January 1990, was diagnosed as a chronic neck sprain. X-rays of her cervical spine showed early degenerative disc

---

7. ALJ Jacknycky suitably restricted Plaintiff from performing hand maneuvers beyond simple grasping and fine manipulation.

disease at C5. She had near full cervical ROM throughout the insured period. Plaintiff's neck pain last restricted her from doing overhead work and heavy lifting in January 1988; ALJ Jacknycky incorporated these restrictions in his hypothetical to the VE. Plaintiff's recurrent back pain in August 1988, December 1988, and August 1992, was diagnosed as mild L5 disc space narrowing with mild arthrosis at 5–1. Despite intermittent ROM limitations, Plaintiff consistently performed straight leg raises [8] to 75 and 90 degrees, exhibited normal reflexes and good heel/toe gait. Lastly, no back pain related vocational restrictions were placed on Plaintiff by any of her physicians.[9] Thus, there is no record medical evidence to support a finding of disability prior to December 1993, or February 1994.

Plaintiff's own testimony further belies the contention that she suffered from constant excruciating pain due to the above listed impairments. Plaintiff testified that at the end of 1993, she used only over-the-counter pain medication. (Tr. 360). *See* 20 C.F.R. § 404.1529(c)(3)(iv)(ALJ can consider medication to assess pain severity); *see also Blacha v. Sec. of HHS,* 927 F.2d 228, 231 (6th Cir.1990)(citing *Kimbrough v. Sec. of HHS,* 801 F.2d 794, 797 (6th Cir.1986)). She also testified that she was able to lift ten pounds (Tr. 345, 356), stand six hours per day (Tr. 356), and perform all of the household chores (Tr. 340–342), which is consistent with an ability to perform light work. *See* 20 C.F.R. § 404.1529(c)(3)(i)(ALJ can consider daily

activities in assessing credibility); *see also Blacha,* 927 F.2d at 231. Further, notations in the pre-onset and post-insured period show Plaintiff's participation in activities that are inconsistent with constant disabling pain. For example, she injured her back lifting a dresser in March 1992; injured her back "routine[ly]" "scrubbing" the kitchen floor in January 1994 (Tr. 74); injured her right foot when she dropped a hand drill in June 1996 (Tr. 193); injured her right elbow washing windows in October 1996 (Tr. 237); and injured her right foot when she dropped a 20 pound steel fan in August 1996 (Tr. 193). *Id.* Notwithstanding these activities, Plaintiff's testimony of hobbies during the insured period included stripping furniture, woodworking, needlepoint, attending softball games, visiting friends, and attending auctions. (Tr. 341–342). This evidence, in addition to the record medical evidence above, provides substantial record support for the ALJ's conclusion that Plaintiff did not suffer from debilitating pain prior to December 31, 1993.

Accordingly, Plaintiff's argument that ALJ Jacknycky's Step Four RFC determination and Step Five hypothetical to the VE failed to incorporate her assertions of constant excruciating pain is meritless. Also, Plaintiff's contention that the VE failed to identify a significant number of suitable unskilled light and sedentary jobs is meritless. As shown above, the VE identified 31,000 such jobs in the regional economy. *See Hall v. Bowen,* 837 F.2d

---

**8.** I note that Plaintiff had positive straight (left) leg raises in August 1992, however, the degree of limitation was not indicated. The next record entry of February 1993, showed that Plaintiff's back pain had subsided and that straight leg raises on testing were negative. (Tr. 74). There are no subsequent back-pain specific complaints or related evidence of treatment in the record until December 1994. (Tr. 167). The only other record of

objective testing was a notation of "unremarkable" right straight leg raises on examination for complaints of hip pain in February 1997. (Tr. 237).

**9.** ALJ Jacknycky's hypothetical suitably restricted Plaintiff from kneeling, crouching, crawling, steps/stairs, heights, and moving machinery.

272, 275–276 (6th Cir.1988)(1,350–1,800 regional jobs is a significant number). Likewise, Plaintiff's argument that a medical expert was necessary to determine the proper onset date is meritless when her asserted onset date (December 18, 1993) was adopted by SSA without challenge, the question of altering it was never raised, and the record does not establish disability during the insured period. Finally, Plaintiff's contention that this case is analogous to *Dominguez v. Apfel*, 55 F.Supp.2d 1172 (D.Kan.1999), is meritless. Aside from its lack of precedential value, the claimant in *Dominguez* was declared not disabled in a Title II proceeding but was awarded benefits in a Title XVI hearing by the same ALJ using the same medical evidence. Here, Plaintiff was never determined to be disabled, she has never filed an application for supplemental security income, and the record evaluation by ALJs Hammerly and Jacknycky does not conflict.

Therefore, I conclude that substantial record evidence supports ALJ Jacknycky's determination that Plaintiff retained the RFC to perform the restricted range of unskilled sedentary and light work prior to the expiration of her insured status on December 31, 1993. In other words, the ALJ's conclusion that Plaintiff was not disabled prior to the expiration of her insured status is substantially supported.

### III. CONCLUSION

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record. Accordingly, I respectfully recommend that the court **DENY** Plaintiff's Motion for Summary Judgment, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.