Joseph MOON, Plaintiff–Appellant,

v.

Louis W. SULLIVAN, M.D., Secretary of Health & Human Services, Defendant–Appellee.

No. 90–1109.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1990.

Decided Oct. 22, 1990.

Kenneth F. Laritz (argued), Warren, Mich., for plaintiff-appellant.

Donna Morros Weinstein, Chief Counsel, Robert Hanson (argued), Dept. of Health and Human Services, Office of Gen. Counsel, Region V, Chicago, Ill., Francis L. Zebot, Asst. U.S. Atty., Office of U.S. Atty., Detroit, Mich., for defendant-appellee.

Before KRUPANSKY and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Claimant Joseph Moon appeals from the district court's order which affirmed the Secretary of Health and Human Services' denial of Moon's claim for a period of disability and disability insurance benefits un-

der the Social Security Act as amended. For the following reasons we affirm the judgment of the district court.

## I.

Moon filed his application for disability insurance benefits on January 25, 1988, alleging that he became disabled and unable to work on November 27, 1977, due to depression and an obsessive compulsive disorder. The Secretary of Health and Human Services (Secretary) denied claimant's application on April 14, 1988. The Secretary denied claimant's application upon reconsideration on June 30, 1988. Dissatisfied with the Secretary's determinations, Moon requested a hearing before an Administrative Law Judge (ALJ). This hearing was held on November 1, 1988.

On January 13, 1989, the ALJ issued his decision denying benefits to the claimant. The ALJ's decision became the Secretary's final decision when the Appeals Council denied Moon's request for review on April 17, 1989. Moon, seeking judicial review of the Secretary's decision, thereafter filed a civil action in the United States District Court for the Eastern District of Michigan pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). On September 29, 1989, the United States Magistrate issued his Report and Recommendation proposing that the Secretary's decision denying appellant's claim be upheld. Claimant filed timely objections to the Magistrate's Report and Recommendation. On November 16, 1989, the district court issued its order granting the Secretary's motion for summary judgment in accordance with the Magistrate's Report and Recommendation. Claimant thereafter filed this timely appeal.

The following evidence was introduced at the November 1, 1988 hearing.

Claimant was born on November 18, 1935, and was 52 years old when he applied for disability insurance benefits on January 25, 1988. After obtaining a Bachelor of Science degree in mechanical engineering, Moon worked in various management positions for the General Motors Corporation, most recently as the Manufacturing Manager for General Motors' Hydramatic Division where Moon managed over 7,000 workers. Moon medically retired from General Motors on November 27, 1977. Claimant thereafter obtained a Juris Doctor degree (*summa cum laude*) from the Detroit College of Law. Moon's subsequent attempt to practice law proved unsuccessful, however, allegedly due to his claimed disability.

Dr. Joseph J. Tiziani, a psychiatrist, first examined the claimant in October, 1977, due to Moon's "increasing inability to function on his job." On June 12, 1978, after reporting that he had met with the claimant 26 times, Dr. Tiziani concluded that Moon was disabled by "decompensating obsessive compulsive neurosis—overwhelming anxiety." After noting Moon's present symptoms ("inability to concentrate or make decisions, feelings of inadequacy and [low] self-esteem") and his poor reaction to treatment, Dr. Tiziani concluded that, since November 1, 1977, Moon has been permanently disabled. Dr. Tiziani noted, however, that the claimant was mentally capable of transacting his personal affairs.

Dr. Tiziani's medical records reveal that Moon did not continue his treatment with the psychiatrist on a regular basis. In fact, on January 29, 1985, Dr. Tiziani noted: "[Joseph Moon] last seen 2–3 years ago." The medical records thereafter indicate that Moon did not see Dr. Tiziani again until March 27, 1986.

On October 27, 1987, Dr. Tiziani summarized Joseph Moon's status in a letter entitled "Narrative Summary on Joseph Moon":

Mr. Moon presented as a tense, anxious male who states that he has become increasingly unable to function, experiencing episodes of anxiety particularly at work. He was preoccupied with every small detail at work and although he had been promoted regularly he was still obsessed with returning to the floor to check on daily production and actually got involved in checking on what workers were doing.... He would come home and feel agitated and distraught, continuing to think about work and wondering if he had checked everything that

he had set out to check. He never felt any sense of relief and would continuously think about the job and what was happening there.

. . . .

Mental status examination revealed a well developed, well nourished white male who appeared to be about his stated age. He was neatly and appropriately dressed.... There was an underlying mood of depression as he talked about his inability to function adequately either in the work situation, as a father, or as a husband. There was no evidence of organicity nor was he delusional or hallucinated. There was no evidence of a formal thinking disorder such as that seen in schizophrenia.

A working diagnosis was established of an Obsessive Compulsive Disorder with a superimposed depressive disorder.

After noting that Moon's ability to concentrate and to perform daily activities had diminished following the claimant's retirement from General Motors, Dr. Tiziani concluded his "Narrative Summary on Joseph Moon" by noting:

Mr. Moon is currently still suffering from an Obsessive Compulsive Disorder with a secondary depression due to loss of his work situation, and his inability to reestablish himself as a productive citizen....

Prognosis must be considered extremely guarded at this time.

In addition to the "Narrative Summary," Dr. Tiziani completed a residual functional capacity assessment form on October 27, 1987. The psychiatrist concluded that Moon's impairments were: "severe" regarding his abilities to respond to supervision and customary work pressures; "moderately severe" regarding Moon's ability to perform his daily activities, his abilities to perform simple and complex tasks, and his ability to relate to other people; "moderately to moderately severe" regarding his ability to respond to co-workers; "moderate" regarding his abilities to perform repetitive or varied tasks; and not limited regarding his ability to understand, carry out, and remember instructions.

On March 18, 1988, Dr. Tiziani reported that Moon's symptoms had persisted, perhaps even increasing in severity, since October, 1987. The psychiatrist noted that the claimant "ha[d] become increasingly anxious and more compulsive and continues in a dyfunctional [sic] state. He has difficulty making decisions about even the most minor things much less making any decisions regarding major events." Though indicating "no evidence of a psychosis or organicity," Dr. Tiziani nevertheless believed that "Mr. Moon remains totally disabled" for the indefinite future. The doctor also noted the claimant's continued reluctance to undergo "tricyletic therapy" (chemotherapy).

On June 2, 1988, Dr. Tiziani completed a "Psychiatric/Psychological Medical Report" regarding the claimant's mental status. The doctor noted that he had discussed "the possibility of drug therapy" with the claimant, but that Moon was reluctant because of: (1) the "profound serious side effects" associated with the medication; and (2) Moon's "difficulty in making any decesion [sic] in his life." Dr. Tiziani added that the claimant had significantly restricted his daily activities and had chosen to withdraw from most situations requiring socializing or decision-making. The doctor noted that Moon had admitted to being very insecure ("Very poor self esteem. Sees himself as a complete waste. Admits to being very insecure."), adding that the claimant felt worthless and hopeless because he was no longer able to function in a work environment, thereby further contributing to his depression ("He has not replaced the many hours spent on the job with any type of meaningful activity. As a result he feels he cannot function as a productive citizen, which only adds to his depression.").

In a letter dated February 15, 1989, Dr. Tiziani stated that the claimant's approach to law school had been highly abnormal, characterized by repeatedly outlining his books and by totally immersing himself in his studies. The doctor added that "[t]here was no necessity to interrelate with other students or co-workers and he could basi-

cally apply rote learning methods to the subject matter without having to respond to supervision, management, deadlines, timing or any other traditional basic work parameters." Dr. Tiziani then described Moon's unsuccessful attempt to clerk at a friend's law firm:

After passing the Bar he was looking forward to working in a friendly environment where a close friend allowed him the opportunity to work in his law firm as a law clerk. As you know, this was a complete failure and this failure was extremely devastating to the patient and confirmed for him how severely emotionally impaired he really was. Mr. Moon would spend days on an entry level task that could have been completed in an hour or two by an unimpaired individual. He was so consumed by his work, that he was unable to make any logical decisions as to when to stop. This was a tremendous setback when it really appeared that Mr. Moon may have some prospects for functioning on a limited basis in a controlled environment.

After indicating that the claimant's ritualistic behaviors consisted of repeating tasks numerous times to insure that they were properly done, Dr. Tiziani concluded:

If Mr. Moon were required to perform unskilled physical labor in order to survive, this would produce a further setback by virtue of the demeaning nature of this type of work as compared to his previous highly skilled employment. He has had much difficulty accepting his inability to perform substantive intellectual tasks and facing unskilled physical labor would be an adjustment to which he would absolutely be unable to cope. Additionally I do not believe that he could keep performing on a sustained basis.

Moon's testimony before the ALJ revealed that the claimant is able to travel, prepare his own meals, drive an automobile, attend church, work crossword puzzles, and care for himself. The claimant further acknowledged that he had recently married "a work-related acquaintance from years back."

Moon's medical records were reviewed in March and June, 1988, by two social security review physicians. Though Dr. Rentea determined that the claimant was "moderately limited" in his "ability to set realistic goals or make plans independently of others," and in his "ability to work in coordination with or proximity to others without being distracted by them," Dr. Rentea nevertheless found Moon to be "not significantly limited" in all other categories listed on the "Mental Residual Functional Capacity Assessment." Similarly, Dr. Khan determined that Moon's mental impairments "slightly" restricted the claimant's daily activities and social functioning, adding that Moon "never" experienced "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation."

Elaine Tripi testified as a vocational expert at the hearing before the ALJ. Tripi classified Moon's past work as ranging from sedentary to light in exertional demand, adding that the claimant had acquired management and technical skills from his past employment. Tripi testified that if Moon's testimony were accepted as accurate, the claimant would be unable to perform his past work. When next asked whether Moon could perform any work, Tripi responded:

It's very difficult for me to form an opinion [regarding] physical activity as opposed to using the mind. There really wasn't much of a discussion as far as his capabilities in that regard. It more had to do with when he gets involved with making judgments and that kind of situation. I would reserve my opinion on that. I really don't feel I have enough information to really know if he could do any type of work.

Tripi, however, later testified that:

There are many people who have panic attacks and who work, and so it was difficult for me to really delineate if his were severe enough, and that's why I reserved an opinion as to if he couldn't do any work at all. You know, he's been able to accomplish an awful lot and even with the distress, he got through it, and

so it's difficult to reconcile that in my mind, and that's why I reserve the opinion.

Tripi acknowledged that Moon would be unable to perform any job existing in the national economy if Dr. Tiziani's assessment of the claimant's functional capacity was correct.

After considering the testimonial and documentary evidence, the ALJ held:

> The claimant has sporadically seen a psychiatrist, Dr. Tiziani, who seems to have indulged in considerable sympathetic advocacy on the claimant's behalf, notwithstanding a paucity of treatment and minimal clinical findings, suggesting that the conclusory opinions of this psychiatrist represent adoption of the claimant's symptoms.
>
> . . . .
>
> The conclusory opinions of inability to concentrate and make decisions and moderately severe impairment of function in most respects and the corresponding advocacy of disability are so grossly inconsistent to this individual's actual accomplishments sustained in law school over more than a four year period that the undersigned believes that the demonstrable achievements carry more weight than unsupported opinions. Even the claimant admitted that he was able to cope with law school despite panic attacks which he claimed could last for minutes to days. His law school performance suggests that the severity of the panic attacks, the degree of interference with concentration, and the extent of indecisiveness obviously have been exaggerated. He maintained that when he tried to work as a lawyer he found himself overwhelmed because of his obsessive-compulsive behavior in that he did not know when to quit researching a problem. Yet, for some reason, he had no problem allocating his time to many rigorous law school courses and [to the] bar exam, exercising appropriate judgment in that context.
>
> . . . .
>
> Despite the claimant's allegations of significant emotional difficulty and despite the sympathetic advocacy voiced by Dr.

Tiziani, his records reveal that he did not see the claimant at all from October 1977 to January 1985, and did not see the claimant again thereafter until March 1986. . . . While Dr. Tiziani speaks of clinical examination, his letter merely reflects superficial reportage as to findings such that the undersigned can only conclude that the mere opinion of disability offered by this examiner simply cannot override the myriad of inconsistencies in respect to the absence of medication, minimal efforts at treatment, absence of any hospitalization or significant intervention, and symptoms which certainly did not impede sustained successful law school performance of many years duration.

> Accordingly, the undersigned concludes that while the claimant may have some impairment of judgment as he voiced in regard to decisionmaking, this deficit would in no way impair the performance of at least a full range of simple, routine and repetitive duties that are the hallmark of unskilled work which would not require him to make appreciable decisions or judgments, even according him the benefit of the doubt. . . .
>
> Accordingly, with a residual functional capacity to perform without physical impairment a full range of unskilled work so as to minimize requirements of judgment and decisionmaking, the claimant falls within the range of rules within the vocational regulations of Appendix 2, Subpart P, Regulations No. 4, [sic] uniformly indicating that he is not disabled.

Moon argues that the Secretary's finding that he had the residual functional capacity to perform a full range of unskilled work (excluding jobs that demand excessive judgment) after November 27, 1977, is not supported by substantial evidence. Specifically, the claimant argues that his depression and obsessive compulsive disorder resulted in a marked limitation of functional capacity.

## II.

### A.

This court has jurisdiction on appeal to review the Secretary's decision pursuant

to 42 U.S.C. § 405(g) which specifies that the Secretary's factual findings are conclusive if supported by substantial evidence. " 'Substantial evidence' means 'more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir.1981) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). When determining whether the Secretary's findings are supported by substantial evidence, we must examine the evidence in the record "taken as a whole," *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980), and we " 'must take into account whatever in the record fairly detracts from its weight.' " *Beavers v. Secretary of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir.1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). The Secretary's determination must stand, regardless of whether the reviewing court would resolve the issues of fact in dispute differently, if the determination is supported by substantial evidence. *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983).

The claimant has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability as defined in 42 U.S.C. § 423(d). If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not found to have an impairment which significantly limits his or her ability to work (a severe impairment), then he or she is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c).

If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments. 20 C.F.R. §§ 404.-1520(d), 416.920(d). *See* 20 C.F.R. §§ 404.-1525(a), 416.925(a). If the claimant suffers from one of the "listed" impairments, benefits are owing without further inquiry. In the instant action, the ALJ found that Moon did not suffer from one of the "listed" impairments. In such a case, assuming the individual had previously worked, the Secretary must next decide whether the claimant can return to the job he or she previously held. 20 C.F.R. §§ 404.1520(e), 416.920(e). By showing "a medical basis for an impairment that prevents him from engaging in his particular occupation," the claimant establishes a prima facie case of disability. *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir.1978). In the instant action, the ALJ found that Moon was not able to return to his particular occupation.

At this step in the analysis it becomes the Secretary's burden to establish the claimant's ability to work. *Allen*, 613 F.2d at 145. The Secretary must prove that, taking into consideration present job qualifications such as age, experience, education, and physical capacity, and the existence of jobs to match those qualifications, the claimant retains the capacity to perform a different kind of job. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1); *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 1953, 76 L.Ed.2d 66 (1983). The Secretary's burden can, on occasion, be satisfied by relying on the medical-vocational guidelines, otherwise known as the "grid." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. If the characteristics of the claimant do not identically match the descriptions in the grid, however, then the grid is used only as a framework or a guide to the disability determination. *Kirk*, 667 F.2d at 528. In the instant action, the ALJ determined that the claimant's characteristics resembled, but did not identically match, the characteristics found in the residual functional capacity grid suggesting no disability. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

### B.

Moon argues that the ALJ erroneously concluded that there was insufficient evidence to support a debilitating impairment arising from the combined effects of claimant's personality disorders beginning November 27, 1977. We reject this argument.

■ In order to establish entitlement to disability insurance benefits, an individual must establish that he became "disabled" prior to the expiration of his insured status. 42 U.S.C. § 423(a) and (c); *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988). The record reflects that the claimant's insured status expired on December 31, 1987. Moon must therefore prove that he became disabled prior to December 31, 1987, in order to qualify for disability benefits.

■ The record fails to support the claimant's allegation that he became disabled prior to December 31, 1987. In fact, the record contains substantial evidence to support the Secretary's determination that prior to December 31, 1987, the claimant retained the residual functional capacity to perform, at a minimum, sedentary and light unskilled work. Light work involves lifting no more than twenty pounds at a time with more frequent lifting or carrying of less than ten pounds. Much walking or standing is often required, though prolonged sitting, with the occasional pushing and pulling of arm or leg controls, is included in this category. 20 C.F.R. § 404.1567(b). Sedentary work involves lifting and carrying small items including files, ledgers and tools weighing no more than ten pounds. A sedentary job entails much sitting with occasional standing and walking. 20 C.F.R. § 404.1567(a). The record contains substantial evidence to support the ALJ's finding that the claimant can perform light and sedentary work despite his mental impairments. The ALJ found the claimant physically able to perform the full range of sedentary and light work. Due to the claimant's personality disorders, however, the ALJ reduced the range of Moon's residual functional capacity by placing restrictions on "open-ended, unstructured type jobs requiring professional judgment and independent decision-making."

■ Moon argues that he has suffered from disabling mental impairments (depression and an obsessive compulsive disorder) since November 27, 1977. A mental impairment must produce work-related limitations that significantly affect the claim-

ant's ability to perform a full range of work at a given exertional level before a mental impairment precludes the use of the medical-vocational guidelines. *Buress v. Secretary of Health & Human Servs.,* 835 F.2d 139, 142 (6th Cir.1987). A claimant must satisfy the documentation requirements of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(B) to establish that a mental disorder reaches the level of severity to be considered disabling: "The existence of a medically determinable impairment of the required duration must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory or psychological test findings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(B). Moon has provided insufficient medical evidence to satisfy this mental disorder documentation requirement. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D) (1989). Dr. Tiziani's medical reports fail to confirm Moon's alleged disabling mental disorder in light of the overwhelming testimonial and documentary evidence contradicting the doctor's conclusions.

Though Moon claims that his depression and obsessive compulsive disorder are disabling, his medical history reveals only sporadic psychiatric visits that were often separated by years. Similarly, though various medications exist, the claimant chose to forego drug therapy due to the possible side effects. Furthermore, though Moon insists that he is unable to make decisions, he nevertheless decided to remarry and to attend law school. Moreover, Moon's contention that he succeeded in law school (*summa cum laude*) by "rote memorization" alone is without merit. Law school exams require students to follow directions, organize their thoughts, and apply a body of knowledge to hypothetical fact situations while under severe time constraints. Moon's success in law school, as well as on the bar examination, clearly indicate that Moon is able to reach decisions (apparently the correct decisions) in a relatively short period of time. The claimant's alleged panic attacks are similarly insufficient to prove disability in light of Moon's success in law school and on the bar examination. Simply stated, though Moon alleges fully disabling and debilita-

ting symptomatology, the ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.

Moon next argues that the ALJ erred by failing to order a consultative examination in this action. Contrary to Moon's contention, however, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Secretary of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917(a)). Similarly, the claimant's reliance on *Wallace v. Secretary of Health & Human Servs.*, 722 F.2d 1150 (3d Cir.1983) ("No conflicting medical opinions were submitted regarding the psychiatric component of disability. The ALJ therefore erred in ignoring this evidence in favor of his own conclusion that there was no evidence of significant mental impairment." *Id.* at 1154), is mistaken. Unlike the ALJ in *Wallace*, the ALJ in the instant action rejected Dr. Tiziani's conclusions based upon the doctor's own clinical findings, Dr. Rentea's and Dr. Khan's medical evaluations, and Moon's testimony. Examining the evidence in the record "taken as a whole," *Allen*, 613 F.2d at 145, the ALJ properly discredited Dr. Tiziani's conclusions regarding the extent of Moon's mental impairment.

The ALJ considered Moon's testimony, determined his credibility, and found the claimant able to perform sedentary, and light, unskilled work subject to certain judgment and decision-making limitations. *See Hardaway v. Secretary of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987) (a reviewing court normally will not disturb the Secretary's credibility determinations). Because the ALJ's findings are supported by substantial evidence, the district court's judgment is AFFIRMED.