### Carolyn O. WILLIAMS,

v.

### Jo Anne B. BARNHART, Commissioner of Social Security.

### No. 3:03–0329.

United States District Court, M.D. Tennessee, Nashville Division.

Aug. 16, 2004.

---

It is legitimate for a state to regulate its TennCare program in this manner.

Michael Patrick Williamson, Nashville, TN, for Carolyn O. Williams.

Mercedes C. Maynor–Faulcon, Office of the United States Attorney, Nashville, TN,

for Social Security Administration c/o Joanne B. Barnhart, Commissioner of Social Security Administration.

## ORDER

WISEMAN, Senior District Judge.

Before the Court is the Report and Recommendation of Magistrate Judge Brown in which he recommends Plaintiff's Motion for Judgment on the Administrative Record be granted and the decision of the Commissioner be reversed and the cause remanded for further administrative proceedings.

The Court has considered the Report and finds the same to be correct in fact and law. For the reasons set forth in the Report and Recommendation, the Motion for Judgment on the Administrative Record by the Plaintiff (Doc. # 13) is hereby **GRANTED**, and the decision of the Commissioner is **REVERSED** and the cause **REMANDED** for further administrative proceedings, to include updating the medical record, rehearing, and the issuance of a new decision.

It is so **ORDERED**.

## REPORT AND RECOMMENDATION

BROWN, United States Magistrate Judge.

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided under Titles II and XVI of the Social Security Act ("the Act"), as amended. Currently pending is plaintiff's motion for judgment on the administrative record (Docket Entry No. 13)[1], to which defendant has responded (Docket Entry No. 20). Plaintiff has replied[2] to defendant's response. (Docket Entry No. 23). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings, to include updating the medical record, rehearing, and the issuance of a new decision.

## I. INTRODUCTION

Plaintiff protectively filed DIB and SSI applications on September 10, 1999, alleging a disability onset date of August 3, 1999 (Tr. 59, 60). These claims were denied and not appealed (Tr. 31–33). Plaintiff again protectively filed DIB and SSI applications on June 19, 2000, again alleging disability beginning August 3, 1999 (Tr. 62–64, 742–744). These applications were denied initially and upon reconsideration (Tr. 34–37). Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on January 23, 2002, and at which plaintiff, two witnesses on her behalf, and a vocational expert (VE) testified (Tr. 847–913). On June 21, 2002, the ALJ issued a written decision finding plaintiff not disabled (Tr. 17–29). The ALJ made the following findings:

1. The claimant met the insured status requirements of the Act as of the alleged disability onset date.

---

1. Docket Entry No. 13 is in fact a "Brief in Support of Motion for Summary Judgment on the Administrative Record," with no separate motion having been filed. However, this pleading will be construed as a motion for purposes of this report.

2. Despite having been denied permission to file a reply brief exceeding the 5–page limit (Docket Entry No. 22), and after having filed a 72–page opening brief, counsel disingenuously appended a 4–page exhibit to his 5–page reply. This exhibit was not considered.

2. The claimant has not engaged in substantial gainful activity since the alleged disability onset date.

3. The claimant has "severe" impairments of drug and alcohol addiction, a seizure disorder, hypertension, obesity, depression and anxiety.

4. The claimant's impairments do not meet or equal in severity any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

5. The claimant's allegations of pain and functional limitations are not credible.

6. The claimant retains the residual functional capacity to perform light work activity that includes lifting and/or carrying up to 20 pounds occasionally, 10 pounds frequently, standing and/or walking up to six hours and sitting up to eight hours in an eight hour workday with occasional climbing of stairs, ramp climbing, balancing, stooping, bending, kneeling, crouching, crawling and squatting; and no climbing of ladders, ropes or scaffolds. She must avoid temperature extremes, dampness, wetness, humidity, fumes, odors, dust, gases, hazardous machinery and unprotected heights. Furthermore, she has moderate limitations in her ability to understand, remember and carry out detailed instructions; and moderate limitations in her ability to maintain attention/concentration for extended periods of time. She also has a fair ability to tolerate stress, and moderate difficulties in dealing with the general public and adapting to changes in the work environment. In other words, simple, uncomplicated jobs not entailing work stress.

7. The claimant cannot perform any past relevant work.

8. The claimant is 51 years old, and was 48 years old at the alleged disability onset date.

9. The claimant has more than a high school education.

10. The claimant has not acquired skills that will transfer to other jobs within the residual functional capacity set out above.

11. The framework of Rules 202.20, 202.21 (before she turned age 50) and Rules 202.13 and 202.14 (after she turned age 50) of the Medical–Vocational Guidelines and VE testimony demonstrate that the claimant has the residual functional capacity to perform jobs that exist in significant numbers in the national economy.

12. Drug and alcohol addiction is a contributing factor material to the issue of disability.

13. The claimant is "not disabled" within the meaning of the Act.

(Tr. 28–29).

On February 12, 2003, the Appeals Council denied Plaintiff's request for review (Tr. 10–11), thereby rendering the ALJ's decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

This review is taken in large measure from plaintiff's brief.

### 1. Plaintiff's Vocational Factors: Age, Education and Work Experience

Ms. Williams was born on 4–26–51, and thus was 48 years old on 8–3–99, her al-

leged disability onset date (Tr. 60). As of the ALJ's 6–21–02 Unfavorable Decision, Ms. Williams was 50 years old. Ms. Williams completed high school, and also obtained a certification as a nurse technician (Tr. 103).

When Ms. Williams underwent a consultative psychological evaluation on 5–30–00, she was administered the Wechsler Adult Intelligence Scale–Revised (WAIS–R), and received the following scores:

| | |
|---|---|
| Verbal I.Q. | 79 |
| Performance I.Q. | 93 |
| Full Scale I.Q. | 84 |

(Tr. 548).

The consulting psychologist, Michael A. Bottari, Ph.D., discussed the WAIS–R results, in relevant part, as follows:

> Verbal skills are considerably weaker than nonverbal ones.... On the test of common sense judgment and understanding social convention, she also did poorly, scoring two standard deviations below the mean. Fund of general knowledge and expressive vocabulary are marginal as is abstract thinking.... Given her report of doing satisfactorily in school and receiving various post-high school certifications, one might have anticipated a higher verbal I.Q. and it is not clear if the seizure disorder possibly affected one portion of the brain and led to the moderate discrepancy in the verbal and performance area for this left-handed woman.

(Tr. 548–549).

Regarding Ms. Williams' work history, during a 17–year period, Ms. Williams worked for approximately four dozen different employers.

## 2. Plaintiff's Medical Conditions

### A. *Seizure Disorder*

Ms. Williams has long been diagnosed with a seizure disorder. She has been tried on more than one anti-epileptic medication; her physicians at St. Thomas Hospital eventually settled upon Depakote (valproic acid) as the medication of choice. (*See* e.g., Tr. 528–529, documenting the switch from Tegretol to Depakote).

Blood tests during the relevant time period show her Depakote level to be in the therapeutic range of 7 of 11 occasions. (Tr. 166–67, 596, 650–54, 675, 689, 697, 700, 706, 723, 726). Plaintiff's blood level was only slightly out of the therapeutic range on one occasion, and she has offered explanations for the other occasions when her Depakote levels were low (Tr. 166–67).

The treatment of Ms. Williams' seizure disorder was complicated by her episodic use of cocaine (*see* e.g., the 8–24–99 Consultation Report of David Uskavitch, M.D., wherein he notes cocaine to be "an incredibly epileptogenic substance"). Tr. 528–529. Nonetheless, she has continued to suffer documented seizure activity even when her urine drug screen for cocaine was negative, and her Depakote blood level tested in the therapeutic range, as her 5–16–00—5–17–00 St. Thomas Hospital hospitalization records establish. (Tr. 514–515). More specifically, a generalized tonic clonic seizure was witnesses in the St. Thomas Hospital clinic where she was treated on 5–16–00, and she was thereafter hospitalized. *Id.* Her urine drug screen for cocaine was negative, and her Depakote level was 61.1, well within the therapeutic range of 50–100. *Id.* The discharge summary from this hospitalization contains the following "Final Diagnosis":

> Final Diagnosis: Generalized tonic clonic seizure likely related to her baseline seizure disorder.

*Id.*

In a questionnaire completed in March 2002 by one of her treating physicians at St. Thomas Hospital Clinic, Kathryn Da-

hir, M.D., Dr. Dahir addressed the issue of the relationship between Ms. Williams' cocaine use and her medical conditions, including her seizure disorder, as follows:

> Ms. Williams' substance abuse affects her ability to take her medications consistently most likely and also is likely to exacerbate her hypertension. However, her medical conditions are not a result of her substance abuse and would still exist in the absence of such use.

(Tr. 682).

A third-Party Seizure Questionnaire was completed on 7–24–00 by Dorothy N. Smith, who gave Ms. Williams a place to live for more than a year. (Tr. 132). Ms. Smith stated that she had last seen Ms. Williams have a seizure in April 2002; that she had seizures once a month; that the "warning signs" were "eye batting—body shaking"; that Ms. Williams would fall down; the seizures usually lasted 2 minutes; and that afterwards she would sleep. *Id.* Ms. Smith described a "large seizure one day" when Ms. Williams "fell out on the bank patio on concrete and hit..." (Tr. 890–891). Ms. Smith also described absence-type seizures or spells, testifying as follows:

> A. And then she has a tendency to like—I mean, just staring like off into space like she—well, she stares, and her eyes—I don't know if she's focusing on anything, but it's like she's somewhere else. You know, like her eyes are just big and staring out.
>
> . . . . .
>
> A. Well, they would last until, you know, like I'd call her name or touch her or something. Then like she snaps back.
>
> . . . . .
>
> A. Well, I've seen it—I've seen it one time like 3 times in a day. It was

just like she's there but she's somewhere else, you know.

. . . . .

> Q. But were you there all day?
>
> A. No, I wasn't there all day.
>
> Q. All right. So you would have seen her part of the day. And on average, how often would she have these staring off into space spells?
>
> A. I would say at least three times a day....

(Tr. 891–892)

Ms. Williams' mother, Mary Todd, gave similar testimony:

> Q. What about what's been described as these spells or mini-seizures where she seems to be staring off into space? What can you tell Judge Cherry about that?
>
> A. I really don't know to say about that because a lot of time she's just there, and you say, Carolyn, Carolyn, Carolyn. And finally she come to herself. But it's like she's in a world all by herself.
>
> Q. What does she look like when that—when she's off in a world by herself?
>
> A. She just got to have that stare. Like she just—to me like she's in a trance. Because I know somebody in a trance—like you say somebody's in a trance or something, just out of it.
>
> Q. How often does that happen?
>
> A. I saw her like that several times. I couldn't Tell you how often.

(Tr. 900)

### B. *Cocaine and Alcohol Use/Abuse*

Ms. Williams has been a user of both alcohol and cocaine. Of the two, cocaine

has clearly been the more problematic drug.

Regarding her alcohol consumption, Ms. Williams wrote in an Activities of Daily Living (ADL) form that she consumed a beer or Crown Royale once a week. (Tr. 125–131). When she was consultatively evaluated by Dr. Davis four days later on 7–25–00, he noted her to be a weekly beer and whiskey drinker. (Tr. 559). During a medical visit on 1–4–01, she acknowledged drinking once a week. (Tr. 667–669). In his consultative evaluation report of 12–14–99, Dr. Ward quoted Ms. Williams as saying "she drinks alcohol but claims she is not alcoholic drinking fairly moderate amounts" (sic) (Tr. 445). During the hearing on 1–23–02, Ms. Williams was asked whether she still drank alcohol, and she responded that "I might drink once a month. I'm not even what you call a social drinker." (Tr. 881). During the period since 8–3–99 (and even before), Ms. Williams has not been described by any medical provider, consultant or other witness as being alcoholic, being drunk, or being an abuser of alcohol.

Regarding her cocaine consumption, Mr. Williams related to Dr. Ward on 12–14–99 that she smoked crack "maybe once a month," and to Dr. Bottari on 5–30–00 that she tended "to smoke cocaine approximately once every two weeks." (Tr. 445, 547). Regarding her use on and after 8–3–99, the record documents her statement on 8–24–99 that she had used cocaine three days prior thereto; a positive drug screen on 9–28–99; her statement on 10–5–99 that she last used cocaine two days prior thereto; a negative drug screen on 5–16–00,[3] along with her statement that she was unsure how many times she had used it in the preceding month, but that she contin-

ued to use it on a reasonably regular basis; her statement on 6–27–00 that she had not used drugs for one month; her statement on 10–31–00 that she had not used drugs for 4–5 months; her statement on 1–4–01 that she had done cocaine several days prior thereto; her statement on 3–5–02 that she had not used drugs since November; and a positive urine screen on 4–23–02. (Tr. 528–529, 706, 693, 598). During the 1–23–02 hearing, Ms. Williams acknowledged using cocaine maybe twice during January 2002. (Tr. 881).

Dr. Ward diagnosed Ms. Williams with "cocaine dependency"; during a 5–00hospitalization, Dr. Jordan Asher referred to both substance abuse and substance dependence; Dr. Uskavitch, a consultant during a hospital ER treatment on 8–24–99 rendered an "Impression" of "Recurrent seizures in this patient with post traumatic epilepsy and history of cocaine abuse"; and treating physician Dr. Dahir diagnosed substance abuse (Tr. 447, 514–515, 528–529, 694, 691).

C. *Cognitive Impairment*

In his 12–19–99 consultative evaluation report, Dr. Ward (who performed only a mental status exam, i.e., he did no other psychological testing) described Ms. Williams in relevant part as follows:

> She was very talkative. She rambles and is difficult to follow. She will interject unrelated statements into her conversation. She appears to be moderately confused at least as evidenced by her verbal output. She is very focused on her own conditions. . . .

Dr. Ward commended in relevant part, as follows:

---

**3.** Urine drug screens were negative for cocaine on 1–12–99 and 2–2–99 as well. (Tr. 492, 705).

This individual is seen as having a possible, rule out, cognitive disorder not otherwise specified possibly due to her earlier head injury. She also has an active cocaine dependency as well as an anxiety disorder NOS. Her difficulty in holding down a job is felt to be related to her difficulties in focusing and staying organized. This was demonstrated in the interview where she had difficulty being organized in conversation and staying focused on the train of thought was being followed. While she is moderately anxious, this does not appear to be the primary difficulty...

(Tr. 445–447)

Dr. Ward's diagnostic impressions included "rule out cognitive disorders NOS." *Id.*

Consulting psychologist Dr. Bottari performed several psychological tests, to wit, the WAIS–R, Trailmaking Test, Bender–Gestalt (with Immediate Recall), Memory for Objects, Wechsler Memory Scale Form I, Rorschach, Thematic Apperception Test (selected cards), and the Minnesota Multiphasic Personality Inventory—II (MMPI–II). (Tr. 548). Dr. Bottari noted that "there was some inappropriate quality to her affect," and a "difficult-to-pinpoint odd presentation." (Tr. 546, 549). Dr. Bottari discussed her performance on the various psychological tests (*see* discussion above regarding the WAIS–R), in relevant part, as follows:

The Trails B task, which is quite sensitive to brain-behavior dysfunction, was done in 194 seconds with one error, which is well within the impaired range. Typically, a time of 90 seconds is viewed as the cut-off for a normal performance. She seemed to lose track of the sequence mid way through the task. On the Wechsler Memory Scale she earned a Memory Quotient of 76. One finds variable memory functions.... Thus, auditory memory tends to be weak as reflected by the great difficulty recalling digits backward, problems with paired associates, and variable performance on recall of paragraph information.

In general, a visual recall may be better and more consistent than auditory recall. The profile above does raise questions about central nervous system dysfunction and the possibility that her seizure disorder, perhaps coupled with her hypertension, has led to compromise, albeit not severe, of cognitive functions and does corroborate her story of being distractable and having uneven memory functioning on a daily basis.

Personality data show more disturbance in terms of thinking than may be obvious upon reviewing her life history, but there is the difficult-to-pinpoint odd presentation. The discrepancy between the test data (to be discussed) and her history, in which she made no attempt to exaggerate any mental problems, speaks to the likelihood that the test data are accurate reflects of her personality status.... Thus, the Rorschach certainly raises serious questions about the quality of her thinking the possibility of paranoia.

The high points (on the MMPI–II) are typical of a person with paranoia and relationships that would be marked by resentment, suspiciousness, and hostility as well as inappropriateness. These persons tend to go through periods of tension and worry and often depression. Difficulties in concentration and attention, memory deficits, and poor judgment are quite common. In general, they are described as "severely and chronically maladjusted even if they are not psychotic...."

Concentration, persistence, and pace are variable and tend toward being moderately to markedly impaired. This is one area in which she does openly report having difficulties, and the test profile including the Trails B and Digit Span Backwards support her subjective assessment.... Thus in reviewing the Social Security listed impairments, one may not find a category that she may clearly satisfy, but there are signs of organic disturbance in the area of memory and concentration with a gap between verbal and nonverbal functions, clearly significantly compromised thinking, and a tendency toward paranoia, and underlying depression. Thus, the combination of the above ought to be strongly considered in determining her ability to work. Given her paranoid tendencies and depression, the stress of failing yet again on the job has probably stretched her tolerance. She is also probably experiencing the cognitive affects of her seizure disorder and possibly her hypertension.

Dr. Bottari did note that one subscore on the MMPI–2 "certainly would raise questions about the possibility of exaggeration of symptoms." (Tr. 550). However, he found that her profile on this test was valid, and noted that "she made no attempt to exaggerate her emotional difficulties during the interview process." (Tr. 550–51).

In completing a mental assessment form, Dr. Bottari noted his diagnoses to be as follows:

1. Psychotic disorder, NOS.
2. Rule out cognitive disorder NOS.
3. Paranoid personality disorder versus traits.
4. Rule out adjustment disorder with depressed mood.

(Tr. 553).

Dr. Bottari noted Ms. Williams to be moderately or markedly impaired in a number of work-related areas of functioning. (Tr. 553–555).

DDS psychological Tom Nielson, Psy.D. noted in his 7–31–00 mental assessment that Ms. Williams suffered from "significantly subaverage general intellectual functionings with deficits in adaptive behavior...", based upon her verbal I.Q. of 79. (Tr. 603–611).

Dr. Dahir noted in March 2002 that Ms. Williams "also reports occasional visual and auditory hallucinations and some of her statements at times appear delusional." (Tr. 683).

As noted above, Dr. Bottari indicated that an adjustment disorder with depressed mood needed to be ruled out. (Tr. 553). Treating physician Kathryn Dahir, M.D. repeatedly diagnosed Ms. Williams as suffering from depression, and prescribed an antidepressant, Celexa. (Tr. 591–592, 583–584, 689–690, 685–686, 727–728, 713–714). In her 6–27–00 mental assessment, Dr. Dahir diagnosed (1) seizure disorder, (2) hypertension, (3) irritable bowel syndrome, and (4) depression, and noted Ms. Williams to be moderately or markedly impaired in several areas of work-related functioning. (Tr. 621–623 and 844–846). DDS psychologist Tom Neilson, Psy.D. noted in the mental assessment forms he completed on 7–31–00 that Ms. Williams suffers from affective disorder, to wit "depressive disorder NOS." (Tr. 603–611). There have also been diagnoses of anxiety, psychotic, and personality disorders. (Tr. 447, 553–55).

In completing a Psychiatric Review Technique form on 1–5–00, a DDS psychologist opined that Ms. Williams' conditions met Listing 12.09 for substance addiction disorder; under the section regarding Listing 12.08 for personality disorders, this DDS psychologist noted that "secondary to

12.09, Ms. Williams experiences 'persistent disturbances of mood or affect,' 'pathologist dependence, passivity or aggressivity,' and 'intense and unstable interpersonal relationships and impulsive and damaging behavior.' " In a similar vein, DDS psychological Dr. Neilson noted in his 7–31–00 Psychiatric Review Technique that Ms. Williams suffered from "inflexibility and maladaptive personality traits" which case either significant impairment in social or occupational functioning or subjective distress, as evidenced by "pathologically inappropriate suspiciousness or hostility," "persistent disturbances of mood or affect," and "pathological dependence, passivity or aggressivity." (Tr. 608).

D. *Gastroesophageal Reflux Disease, Gastritis, Hiatal Hernia, Diverticular Disease, Ovarian Cyst with Chronic Abdominal Pain, Irritable Bowel Syndrome*

On 12–31–98, plaintiff was seen at Vanderbilt University Medical Center (VUMC) ER for "abdominal pain syncope." (Tr. 623–625). She was diagnosed with a "right ovarian mass." When she was admitted to St. Thomas Hospital on 1–12–99, her chief complaint was "abdominal pain." (Tr. 531–534). The "Principal Diagnosis" from her 1–12–99—1–14–99 St. Thomas Hospital hospitalization was "right lower quadrant abdominal pain, rule out appendicitis, rule out ovarian cyst." (Tr. 379–381). She was again hospitalized at St. Thomas Hospital from 12–8–00 to 12–19–00; her discharge diagnoses included "abdominal pain secondary to right ovarian cyst of a longstanding duration." (Tr. 650–664). A "benign ovarian cyst" was removed through surgery at Baptist Hospital on 1–4–01. (Tr. 670–671).

E. *Obesity*

On 7–25–00, Dr. Davis noted Ms. Williams to be 5′4½″ tall, and to weigh 205 pounds. (Tr. 559). His diagnoses included "1) Class I obesity (body mass index>30 kg/m2)." (Tr. 560).

F. *Pulmonary Condition*

On 7–25–00, Dr. Davis diagnosed Ms. Williams with "cigarette aggravated bronchial asthma." (Tr. 560). She was seen four days later at the St. Thomas Hospital ER for "shortness of breath," and diagnosed with "1) acute bronchitis, 2) COPD exacerbation, and 3) tobacco use." (Tr. 563–564). She was again seen at the St. Thomas Hospital ER on 10–29–01 with similar complaints, and diagnosed with "1) chronic obstructive pulmonary disease, 2) bronchitis, and 3) viral upper respiratory infection." (Tr. 729–734).

G. *Medication Side Effects*

Throughout both her medical treatment history and the disability application process, Ms. Williams has repeatedly and consistently complained of severe medication side effects, including day-time sleepiness, concentration and memory problems, and frequent urination (2–3 times per hour). (Tr. 125–131, 116–123, 789–800, 767–771, 806, 528–529, 385). Dr. Dahir acknowledged that Ms. Williams "reports her Depakote and Tegretol cause day-time somnolence." and acknowledged that "these drugs do have central nervous system side effects . . ." (Tr. 681).

3. **Ms. Williams' Hearing Testimony**

At the 1–23–02 hearing, Mr. Williams described the difficulty she had getting jobs because of her seizure disorder. (Tr. 856–857). She also stated that her medication made her sleepy, and also made her lose concentration, such that she had lost jobs because of these problems. (Tr. 857). She described difficulty working in jobs where the environment was too hot, and

either getting sick or having seizures in such environments. (Tr. 857–858). She experienced trouble losing her train of thought. (Tr. 860). She associated her day time sleepiness with not only her Depakote, but also with her antidepressant, Celexa. (Tr. 861). During a discussion of the dozens of different employers she had worked for, she indicated that she "couldn't move fast enough for them." (Tr. 864–865). When asked "how many different employers do you think have told you you're not working at a fast enough pace?", she responded "the majority of them." (Tr. 865).

Regarding the chronic abdominal pain which she had experienced, Ms. Williams acknowledged that the cyst removal surgery she underwent at Baptist Hospital in January 2001 had "took care of that." (Tr. 865). Before that surgery, the abdominal pain had affected her ability to work as follows:

> Well, I couldn't bend, or walk, or, you know, step up to pick up anything heavy, anything over 20 pounds.

(Tr. 866)

Ms. Williams also described a severe problem with urination frequency, stating that she had to go "maybe like 2 or 3 times," "sometimes twice an hour" to the bathroom to urinate. (Tr. 866). She related this problem to her blood pressure medication (although Dr. Dahir noted in her 3–02 Questionnaire that there was "no medical cause to explain this behavior, the patient is on a diuretic, however, this would not explain the frequency.)" (Tr. 866, 679).

When asked by the ALJ why she was not seeing a psychiatrist or psychologist on a regular basis, Ms. Williams stated "I don't have no reason to." (Tr. 878–879).

### 4. Testimony of Ms. Williams' Witness, Dorothy Smith

Dorothy Smith testified that she let Ms. Williams live in her home for "maybe a year and a half," with this period ending "during the summer months, I think, of 2001." (Tr. 891, 896). In return for being given a place to stay, Ms. Williams helped Ms. Smith with her two nephews; this involved being "there when they got on the school bus and when they came home in the evenings." (Tr. 890).

Ms. Smith described Ms. Williams' daily activities while the kids were gone to school as "probably just watch TV and just sleep. Because I mean she could fall off to sleep and go into a deep sleep." (Tr. 892). Regarding the ovarian cyst which Ms. Williams had surgery to remove in January 2001, Ms. Smith testified as follows:

> She was living with me then. She had a lot of problems. I mean, she constantly complained about her stomach hurting.... She was constantly complaining about her stomaching hurting and she had a lot of constipation. She was always complaining about that.

(Tr. 892–893).

Ms. Smith described Ms. Williams' problems focusing on what she was supposed to be doing, and further testified to plaintiff's mood disturbances, paranoia, and poor memory (Tr. 893–94).

Ms. Smith was asked about Ms. Williams' alcohol and drug use, and responded:

> I know she didn't drink very much, and she know that I—and with drugs, you don't do that at my house. But I know that she did do drugs because I found some things that was like drug-related. But she knows—I never actually saw her do them there because she knew I wouldn't tolerate it there.... But she didn't drink very much like beer and

stuff. She might drink some kind of liquor. But beer, you know, she didn't drink very much of that....

(Tr. 894–895)

In response to follow-up questioning by the ALJ, Ms. Smith described the drug-related items she found in her house as being a little green case which had a razor blade and "little antenna thing" in it, as well as some steel wool and some kind of "little glass thing." (Tr. 895–896).

## 5. Testimony of the Vocational Expert

The ALJ described the VE a hypothetical claimant who was 50 years old, had a high school education and the additional education described by Ms. Williams during her hearing testimony, who was limited to light work with 6 hours standing or walking, with certain postural and environmental limitations, with only a fair ability to tolerate work stress, and with a moderate impairment in the ability to understand, remember and carry out simple instructions, the ability of attention and concentration, and in the ability to work with the general public. (Tr. 907). The ALJ summarized the hypothetical claimant as someone who could perform "simple, uncomplicated jobs not entailing work stress, in effect." (Tr. 907–908). VE Brenton testified that this hypothetical claimant could not perform any of Ms. Williams' past relevant work, but could perform a significant number of other jobs (Tr. 908).

In response to further questions by the ALJ, the VE testified that the limitations assessed by DDS psychologist Tom Neilson (Tr. 603–622) would render the identified jobs, as well as all other work, unavailable. (Tr. 909).

In response to cross-examination questioning, VE Brenton testified as follows:

1. If the hypothetical claimant could not stand or walk 6 hours in an 8-hour workday, then the individual could not perform the identified light jobs.

2. If the hypothetical individual had to go to the restroom 2 to 3 times per hour to urinate, then the individual could not perform any of the identified jobs.

3. If the hypothetical individual experienced the "spells" of altered awareness described during the hearing testimony at a rate of up to 3 times per day, then the individual could not perform the identified jobs.

4. If the hypothetical individual had a marked impairment in his or her ability to deal with the public (instead of a moderate impairment), the cashier and clerk occupations would be eliminated.

5. The limitations noted in Dr. Bottari's mental assessment form would preclude performance of substantial gainful activity.

6. The limitations noted by Dr. Dahir in her mental assessment would preclude performance of substantial gainful activity.

(Tr. 909–911).

## III. CONCLUSIONS OF LAW

### A. *Standard of Review*

■■■ This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir.1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that deci-

sion. *Landsaw v. Secretary,* 803 F.2d 211, 213 (6th Cir.1986).

■■ "Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner,* 203 F.3d 388, 389 (6th Cir.1999) (*citing Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir.1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her,* 203 F.3d at 389 (*citing Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary,* 753 F.2d 517, 519 (6th Cir.1985).

### B. *Proceedings at the Administrative Level*

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which as lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir.1990).

■■ The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's

---

4. The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary,* 820 F.2d 777, 779 (6th Cir.1987).

■ In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. *Plaintiff's Assignments of Error*

■ Of plaintiff's fifteen claims of error, the first is, in the undersigned's view, sufficiently meritorious to require reversal of the Commissioner's decision and further administrative attention: the failure of the ALJ to follow the regulatory procedure for evaluation of drug addiction, established in 20 C.F.R. § 404.1535.

A 1996 amendment to the Social Security Act provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the

individual is disabled." 42 U.S.C. § 423(d)(2)(C). The Commissioner's regulations implementing[5] this standard clearly require that the sequential evaluation process be followed in adjudicating disability before any consideration is given to whether drug addiction is the cause of such disability. 20 C.F.R. §§ 404.1535(a), 416.935(a). To find that drug addiction is a contributing factor material to the determination of disability without first finding the claimant disabled, as the ALJ did here, is to put the cart before the horse:

> The implementing regulations make clear that a finding of disability is a condition precedent to an application of § 423(d)(2)(C). The Commissioner must first make a determination that the claimant is disabled. [She] must then make a determination whether the claimant would still be found disabled if he or she stopped abusing [drugs].... The ALJ cannot begin to apply § 423(d)(2)(C) properly when, as here, he has not yet made a finding of disability.

*Drapeau v. Massanari,* 255 F.3d 1211, 1214–15 (10th Cir.2001); *see also* Frank S. Bloch, *Bloch on Social Security* § 3.39 (2003); 3 Soc. Sec. Law & Prac. § 42:143 (Substance Addiction Disorders).

The same conclusion has been drawn by the Eighth Circuit Court of Appeals, which has spoken at length about how an ALJ is to account for substance use disorders in disability determination proceedings. *See Brueggemann v. Barnhart,* 348 F.3d 689, 693–95 (8th Cir.2003). In *Brueggemann,* the court noted that the language of § 404.1535 "plainly requires the existence

---

5. Sections 404.1535 and 416.935 in fact predate the statutory amendment, but have continued to be applied in determining the Commissioner's duties when there is medical evidence of drug addiction or alcoholism, though the remainder of the regulations in

that series dealing with drug addiction and alcoholism, §§ 404.1536–404.1541 and 416.936–416.941, have been superceded by the amendment. *Jackson v. Barnhart,* 60 Fed.Appx. 255, 256 n. 1 (10th Cir. March 24, 2003) (unpublished).

of a 'current disability determination' before the substance use disorders are even considered", and further found as follows:

> In truth, the ALJ's failure to cite 20 C.F.R. § 404.1535 anywhere in his decision was not a mere drafting oversight, but accurately reflected his failure to follow the procedures prescribed there. The Commissioner has duly promulgated regulations in this area, which the ALJ may not silently disregard....

> The plain text of the relevant regulation requires the ALJ first to determine whether Brueggemann is disabled. 20 C.F.R. § 404.1535(a)("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." (emphasis added)). The ALJ must reach this determination initially, as the ALJ did in *Fastner v. Barnhart*, 324 F.3d 981, 986 (8th Cir. 2003), using the standard five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders. *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir.2001). The ALJ must base this disability determination on substantial evidence of Brueggemann's medical limitations without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes

> . . .

> If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of substance use disorders are absent....

> Only after the ALJ has made an initial determination 1) that Brueggemann is

disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether Brueggemann's substance use disorders are a contributing factor material to the determination of disability. If this process proves indeterminate, an award of benefits must follow. The alternative procedure adopted by the ALJ in this case remains inconsistent with the regulations binding on claimants, the ALJs, and this court. The ALJ's decision reflects legal error.

*Id.*

Here, the ALJ's summary finding at the conclusion of his decision (Tr. 27–28) and failure to cite § 404.1535 or 416.935 in that decision reflect his misunderstanding of the procedure to be followed in analyzing the impact of plaintiff's drug addiction. The government argues, quite briefly, that the ALJ's finding that "[d]rug and alcohol addiction is a contributing factor material to the issue of disability" (Tr. 29) was inadvertent and, at worst, a harmless error in view of substantial evidence supporting the decision. However, inadvertent or otherwise, the inclusion of this finding does not affect the analysis that preceded it, nor does it remedy that erroneous approach to the evidence of plaintiff's drug use. *Cf. Fastner v. Barnhart*, 324 F.3d 981 (8th Cir.2003).

In *Fastner*, as here, the ALJ found claimant's addiction to be a severe impairment at step two of the sequential evaluation process, and proceeded to analyze claimant's residual functional capacity and ability to perform past relevant work and other jobs in light of all his impairments, including alcoholism. *Id.* at 984–85. Relying on VE testimony to carry his step five burden, the ALJ found that claimant could

perform a significant number of jobs in the economy which would accommodate claimant's impairments, including the need for "an alcohol-free environment." *Id.* at 985 n. 4. After finding claimant not disabled following the sequential evaluation process, "[t]he ALJ went on to find that '[t]he medical evidence establishes that alcoholism is a contributing factor material to the determination of disability. The claimant would not be disabled by his other impairments if he stopped using alcohol.'" *Id.* While recognizing the inconsistency of the ALJ's findings with regard to claimant's alcoholism, the Eighth Circuit held that the ALJ's finding of materiality was merely superfluous, not reversible legal error, inasmuch as a materiality determination "is only necessary if the ALJ has found that the sum of that individual's impairments would otherwise amount to a finding of disability." *Id.* at 986.

In the instant case, the ALJ found plaintiff's drug and alcohol addiction to be a severe impairment at step two, but rather than considering the cumulative effect of this addiction and plaintiff's seizure disorder (i.e., the limitations imposed by the seizure disorder *as exacerbated* by cocaine abuse) during the remaining steps of his analysis, the ALJ considered her cocaine addiction as detracting from the credibility of her complaints of seizure activity and other symptoms. He then included in his RFC assessment a restriction against working around dangerous machinery and unprotected heights "as a safety feature to accommodate her seizure disorder" (Tr. 20), presumably to protect against such seizures as plaintiff might suffer despite full compliance with medical treatment and abstinence from substance abuse. Thus, unlike the ALJ in *Fastner*, the ALJ here essentially considered the net effect of plaintiff's severe impairments during the sequential evaluation process, rather than the gross effect of that combination of impairments, and then proceeded to find that "drug addiction/alcoholism are 'material,' that is, the claimant would not be disabled if she stopped the polysubstance abuse." (Tr. 28). In so doing, the ALJ failed to apply the correct legal standard for evaluating plaintiff's drug addiction. *See Brueggemann, supra; Drapeau, supra.*[6] Accordingly, it is concluded that the case should be remanded for further administrative consideration of the issue.

The undersigned has endeavored to ascertain the extent to which the above described error could be deemed harmless, as it would seem that plaintiff cannot place principal reliance on her seizure disorder while continuing to abuse cocaine, a substance which her doctors describe as "incredibly epileptogenic" and likely to provoke seizure activity despite full medication compliance. However, while it may be assumed that the sum of plaintiff's severe impairments would in fact be disabling, the requirements imposed by 20 C.F.R. § 404.1535(b) involve specific fact-finding which must be done in the first instance by the ALJ, and which the ALJ's decision as presently constituted cannot be said to encompass. Specifically, having acknowledged some degree of residual seizure activity by imposing a workplace limitation from exposure to unprotected heights and hazardous machinery (consistent with documentation of seizure activity despite a therapeutic Depakote level and

---

**6.** The undersigned has found no contrary, published authority from the Sixth Circuit. Of the unpublished Sixth Circuit opinions reviewed, only one appears to ratify an ALJ decision finding the claimant not disabled pursuant to the sequential evaluation process, and further finding that claimant not disabled but for his alcoholism. *See Price v. Apfel,* 2000 WL 1175574 (6th Cir. Aug. 10, 2000). This one-page, unpublished order did not appear to consider the argument made in this case and those cited in this report, however, and is simply not as compelling as the authorities cited above, in the undersigned's view.

negative drug screen (Tr. 514–15)), the ALJ must make specific findings based on the medical evidence regarding the extent to which these seizures might occur in the absence of drug use, as well as similar findings with regard to the symptoms associated with her mental impairments.

Accordingly, the undersigned must conclude that the decision of the Commissioner should be reversed and the cause remanded for further administrative proceedings, including updating the medical record, rehearing, and issuance of a new decision.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for further administrative proceedings, to include updating the medical record, rehearing, and the issuance of a new decision.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed to this Report in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

Dated July 26, 2004.